**WOMEN PRISONERS OF the DISTRICT OF COLUMBIA DEPARTMENT OF CORRECTIONS, et al., Plaintiffs,**

v.

**DISTRICT OF COLUMBIA, et al., Defendants.**

**Civ. A. No. 93–2052 (JLG).**

United States District Court, District of Columbia.

Aug. 14, 1995.

Peter J. Nickles, Caroline M. Brown, Covington & Burling, Washington, DC, Brenda V. Smith, Deborah L. Brake, National Women's Law Center, Washington, DC, for Plaintiffs.

Richard Love, Maria Amato, Office of the Corporation Counsel, Washington, DC, Grace M. Lopes, Special Officer of the Court, Washington, DC, Seattle, Washington, for Defendants.

### *MEMORANDUM*

JUNE L. GREEN, District Judge.

### I. Introduction

This matter is before the Court on the Defendants' Revised Motion to Stay and/or Modify Judgment. The Court shall deny the Motion to Stay because the Defendants have not met the necessary standards used to justify such action. The Court, however, will modify certain provisions of the remedial Order of December 13, 1994, 877 F.Supp. 634, as amended ("the Order").

### II. Background

This matter came before the Court as a class action in which women prisoners at the Lorton Minimum Security Annex ("Annex"), the Correctional Treatment Facility ("CTF") and the Central Detention Facility ("Jail") sued the Defendants and asked the Court to grant them declaratory and injunctive relief in order to correct alleged violations of the Fifth Amendment, the Eighth Amendment, Title IX and the D.C.Code Ann. § 24–442 (1989).

The Court held a three week trial and found Defendants liable for certain constitutional violations via 42 U.S.C. § 1983 (1994) and statutory violations of D.C.Code Ann. § 24–442 (1989). The Court issued a Memorandum Opinion ("Mem.Op.") and an Order which sought to correct the specific constitutional and statutory violations. The Defendants subsequently filed a Motion to Stay and/or Modify the Order and the Court denied it. The Defendants then sought a Stay of the Order in the United States Court of Appeals for the District of Columbia Circuit. The Court of Appeals ordered that the case be held in abeyance pending additional proceedings on the Defendants' Motion to Stay in this Court. *Women Prisoners of the District of Columbia Dept. of Corrections v. District of Columbia,* No. 95–7041 (D.C.Cir. April 4, 1995). The Defendants ultimately filed a Revised Motion to Stay and/or Modify Judgment. After a review of the parties' briefs and oral argument, the Court temporarily stayed 30 paragraphs of the Order and ordered the parties to attempt to negotiate an agreement on those paragraphs. *Women Prisoners of the District of Columbia Dept. of Corrections v. District of Columbia,* No. 93–2052 (JLG) (D.D.C. May 16, 1995). In commendable fashion, the parties were able to reach agreement on 26 paragraphs. The results are embodied in the Joint Status Motion and Motion Proposing Modifications to the Order for Injunctive and Declaratory Relief ("Joint Motion"). The Motion to Stay as it relates to the four remaining provisions and the Motion to Modify which was based on legal and practical arguments are left for resolution.

In the Joint Motion, the parties informed the Court that the Defendants seek a stay of Paragraphs 20, 43, 79 and 96 of the Order. Although the parties agreed to modify Paragraphs 20 and 43, the Defendants requested a stay due to lack of funds to hire additional medical staff. The four paragraphs, as modified, provide the following:

20. The Defendants shall hire within 90 days:

(a) a health educator with appropriate training in obstetrics and gynecology in a half-time position who shall provide clinical and health educational services to the entire female prisoner population; and

(b) an additional nurse practitioner, physician's assistant with special training in obstetrics and gynecology, or nurse midwife to provide clinical services to women prisoners at CTF.

43. The health educator shall implement, within 60 days from the day that the health educator is hired, an obstetrical and gynecological health education program that satisfies a recognized national medical standard. Educational material should also be made available in the CTF library. The Defendants shall maintain adequate documentation on the program so that it can be evaluated by the Court within 60 days after implementation.

79. The Defendants shall provide women prisoners at CTF with at least one apprenticeship program as defined by Department order.[1]

96. The Defendants shall immediately provide all women prisoners at CTF, including pregnant prisoners subject to medical approval, with recreation for twenty-five hours per week. Women shall have the option of going outside or to indoor recreation facilities during the time period. This recreation schedule shall be effective at CTF within 15 days of this Order.[2]

## III. Analysis of Motion to Stay

 In deciding the Defendants' motion for a stay, the Court must determine whether the Defendants have demonstrated a strong showing that they are likely to prevail on the merits of the appeal and that they will be irreparably injured in the absence of a stay. *WMATC v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C.Cir.1977). The Court also must determine whether a stay would substantially harm other parties interested in the proceedings and whether the public interest would be served by a stay. *Id.* When the other three factors strongly favor granting a stay, a Court may exercise its discretion to grant a stay "if the movant has made a substantial case on the merits." *Id.* Essentially, the Court may properly stay its own order when it has "ruled on an admittedly difficult legal question and when the equities of the case suggest that the status quo should be maintained." *Id.* at 844–45.

### A. Merits of the Appeal

#### 1. D.C.Code Ann. § 24–442 (1989)

 Paragraphs 20 and 43 of the Order rest on the Court's finding of a lack of adequate obstetrical and gynecological care at CTF in violation of D.C.Code Ann. § 24–442 (1989). The statute provides, in pertinent part:

[The] Department of Corrections ... shall ... be responsible for the safekeeping, care, protection, instruction, and discipline of all persons committed to [facilities under its jurisdiction].

D.C.Code Ann. § 24–442 (1989). This statute "implicitly recognizes the common law rule which imposed upon prison authorities, a duty to exercise reasonable care under the circumstances in the protection and safekeeping of prisoners." *Toy v. District of Columbia*, 549 A.2d 1, 6 (D.C.1988). Nothing in the statute explicitly curtails the equity jurisdiction conferred on the Court by D.C.Code Ann. § 11–921(a) (1995).[3] The

---

1. The original order mandated two apprenticeship programs. In the Joint Motion, the parties informed the Court that each side would file separate motions detailing their proposals as to these two provisions. The Plaintiffs filed their proposal with the Joint Motion. The Court, as of this date, has received nothing from the Defendants. As more fully stated in Section IV(B) of this Memorandum Opinion, the Court adopts the Plaintiffs' proposed modification of this provision.

2. The original order mandated thirty-five hours of recreation per week. As more fully stated in Section IV(B) of this Memorandum Opinion, the Court adopts the Plaintiffs' proposed modification of this provision.

3. When exercising pendent jurisdiction over a state law claim, the Court has the same equitable powers as the state court. *West Allis Memorial Hospital, Inc. v. Bowen*, 852 F.2d 251, 257 (7th Cir.1988).

District of Columbia Court of Appeals has "always construed this grant of jurisdiction broadly ... [and] ha[s] upheld [the Superior Court's] exercise of equitable jurisdiction in a variety of contexts, even when statutes did not explicitly provide access to the Superior Court." *Hessey v. Burden*, 615 A.2d 562, 571 (D.C.1992) (citations omitted).

■ The Defendants argue that the statute merely extends the common law of torts to prisons and does not permit equitable relief to prevent future torts. Implicit in the argument is the view that the common law of torts forbids injunctive relief to prevent future torts. It is well-settled, however, that the common law recognizes that an important form of remedy for a tort is an injunction, granted before any damage occurs. *Berrien v. Pollitzer*, 165 F.2d 21, 22 (D.C.Cir. 1947) ("No one can seriously contend that money is an adequate remedy for all sorts of personal wrongs. Clearly 'injunctions and similar flexible remedies of equity are much better suited than a speculative action for damages to protect [personal] interests....' "); *see also Prosser and Keeton on The Law of Torts*, Ch. 1, § 1 p. 2 (5th Ed.1984).

■ In negligence actions where irreparable injury is threatened, a court may act by injunction to prevent harm before it occurs. *Prosser and Keeton on The Law of Torts*, Ch. 5, § 30 p. 165 n. 8 (5th Ed.1984). The availability of an injunction against a threatened tort depends upon various factors including "the relative adequacy to the plaintiff of an injunction and of the other remedies, plaintiff's laches or unclean hands, the relative hardship likely to result to defendant if an injunction should be granted and to plaintiff if it should be denied, the interests of third persons and of the public and the practicability of framing and enforcing the order of judgment." Restatement (Second) of Torts, Ch. 48 § 933(1) p. 559 and Comment a. on Subsection (1) p. 560 (1979). The threatened tort must be of sufficient seriousness and imminence to justify coercive relief. Restatement (Second) of Torts, Ch. 48 § 933 comment b. on Subsection (1) p. 561 (1979). A common method of proving a threat of a future tort is by proving a past tort under

conditions that render its repetition or continuance probable. *Id.* It is not necessary, however, to prove a past wrong. *Id.*

■ The Defendants' failure to meet the standard for obstetrical and gynecological care is the proximate cause of past injuries and it is reasonably foreseeable that their actions or inactions will lead to future injuries to the Plaintiffs. The Defendants' failure appropriately to educate women prisoners results in their refusal of medical help. Inadequate examinations and follow-up treatment permit cervical and breast cancer, opportunistic infections in AIDS patients, sterility as a result of chlamydia and gonorrhea, peritonitis from gonorrhea, and aortic aneurysms, dementia, psychosis or death from syphilis. Plainly, an award of damages is no remedy for these medical problems. Furthermore, women prisoners do not have the option of finding other doctors. Only equitable relief will provide an adequate remedy.

■ The Defendants argue that the Court should refrain from using its equitable powers in the absence of any guidance from the District of Columbia Court of Appeals interpreting § 24–442. This Circuit, however, has affirmed an order of equitable relief in the absence of any District of Columbia decisional law. *See Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 828 n. 18 (D.C.Cir.1984) (stating, "Since no District of Columbia decisional law is on point here, we must make a predictive judgment about D.C. law.")

■ The Defendants argue that § 24–442 should be interpreted like 18 U.S.C. § 4042 (1985) which provides federal prisoners with a tort remedy in damages but not equitable relief. Federal prisoners, however, may not sue for injunctive relief because such a remedy is precluded by the doctrine of sovereign immunity and the Federal Tort Claims Act does not provide a waiver of sovereign immunity for equitable relief. Federal prisoners may maintain an action in tort for money damages because the Federal Tort Claims Act, 28 U.S.C. § 2674 (1994) carves out an exception to the doctrine. Section 18 U.S.C. § 4042 (1985) simply estab-

lishes the Bureau of Prisons' duty of care.[4] The District of Columbia, lacking sovereign immunity, does not possess a similar shield to protect it from claims for injunctive relief. *See Wade v. District of Columbia*, 310 A.2d 857, 861 (D.C.1973).

 The Defendants also argue that the Court should not have exercised supplemental jurisdiction over the § 24–442 claim pursuant to 28 U.S.C. § 1367 (1993). That statute provides, in pertinent part:

(b) [I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction,[5] or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

The claims under § 24–442 are so related to claims in the action within the Court's original jurisdiction that they form part of the same case or controversy. A Court has the authority to reach a state law claim when a non-frivolous claim arising under federal law and one arising under state law emerge from a common nucleus of operative fact. *Common Cause v. District of Columbia*, 858 F.2d 1, 10 (D.C.Cir.1988) (quoting *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966)). The justification for such an exercise of jurisdiction "lies in considerations of judicial economy, convenience and fairness to litigants." *United Mine Workers of America v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1139.

 Although the Court did not address the issue of gynecological care under the Eighth Amendment, the Court holds that the constitutional claim is not "so attenuated and unsubstantial as to be absolutely devoid of merit." *Hagans v. Lavine*, 415 U.S. 528, 536, 94 S.Ct. 1372, 1379, 39 L.Ed.2d 577 (1974).[6] The record is replete with instances of profound suffering caused by inadequate obstetrical and gynecological care at CTF. This factual situation is a far cry from one in which a state cause of action is bootstrapped on to a frivolous constitutional claim.

The statute conferring supplemental jurisdiction is permissive in that it provides that a district court "may" decline to exercise supplemental jurisdiction over a state law claim for the enumerated reasons. The Court does not find any reason under 28 U.S.C. § 1367(c)(1)–(4) (1993) to relinquish jurisdiction over the § 24–442 claims.

The claim does not raise a novel or complex issue of District of Columbia law. The standard of care in the statute has been clarified so as to preclude any ambiguity. *See District of Columbia v. Mitchell*, 533 A.2d 629, 648 (D.C.App.1987) (holding physicians owe same standard of care to prisoners as physicians owe to private patients general-

---

4. The Defendants claim that District of Columbia decisions interpreting § 24–442 have relied on federal interpretations of 18 U.S.C. § 4042 (1985). Local decisions comparing 18 U.S.C. § 4042 (1985) with § 24–442, however, have done nothing more than to observe that both statutes establish a similar standard of care for prison officials in their respective jurisdictions. *See Matthews v. District of Columbia*, 387 A.2d 731, 734 (D.C.Cir.1978); *Ross v. United States*, 641 F.Supp. 368, 371 (D.D.C.1986).

5. The Court did not reach the constitutional claim.

6. The Defendants are disturbed that the Court refrained from deciding the constitutional question in favor of applying the District of Columbia Code. The Supreme Court, however, in *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 117, 104 S.Ct. 900, 917, 79 L.Ed.2d 67 (1984) provided the following guidance: "[A] federal court may resolve a case solely on the basis of a pendent state-law claim ... [and] the court usually should do so in order to avoid federal constitutional questions...."

**668**

ly). The exercise of injunctive relief is explicitly authorized by D.C.Code Ann. § 11–921(a) (1995) and is an unexceptional feature of common law.

The claim does not substantially predominate over the constitutional or Title IX claims "whether in terms of proof, or the scope of the issues raised, or of the comprehensiveness of the remedy sought." *See United Mine Workers of America v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966). Furthermore, there are no other compelling reasons for declining jurisdiction.

 The Defendants argue that application of § 24–442 is barred by the 11th Amendment to the United States Constitution.[7] The Defendants support this argument with the case of *Pennhurst State School & Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984), in which the Supreme Court held that the Eleventh Amendment prohibits federal courts from granting relief against state officials on the basis of state law. The District of Columbia, however, is not a state for the purposes of the Eleventh Amendment. *Committee of Blind Vendors v. District of Columbia,* 695 F.Supp. 1234, 1241 n. 6 (D.D.C.1988); *See Morris v. WMATA,* 781 F.2d 218, 228 (D.C.Cir.1986) ("[H]ad Maryland and Virginia created WMATA without the participation of the District of Columbia, we would conclude that WMATA enjoys eleventh amendment immunity as an instrumentality of the state.") *Cf. Bolling v. Sharpe,* 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) (District of Columbia not a "state" under the Fourteenth Amendment). It is well-settled that the District of Columbia is a municipality. *Jones v. District of Columbia,* 323 F.2d 306, 309 (D.C.Cir.1963); *La Forest v. Board of Commissioners,* 92 F.2d 547, 548 (D.C.Cir.1937). The Eleventh Amendment does not protect municipalities. *Will v. Michigan Dept. of State Police,* 491 U.S. 58,

70, 109 S.Ct. 2304, 2312, 105 L.Ed.2d 45 (1989). The District of Columbia, therefore has no immunities under the Eleventh Amendment.

## 2. Title IX[8]

Paragraphs 79 and 96 of the Order rest on the Court's finding of an inequality of programs offered at CTF in violation of Title IX and its implementing regulations. The Court, therefore, must examine these laws.

Title IX of the Education Amendments of 1972 provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance...." 20 U.S.C. § 1681(a) (1990).

 Under Title IX, "state prisons receiving federal funds are required ... to make reasonable efforts to offer the same educational opportunities to women as to men. Although the programs need not be identical in number or content, women must have reasonable opportunities for similar studies and must have an equal opportunity to participate in programs of comparable quality." *Jeldness v. Pearce,* 30 F.3d 1220, 1229 (9th Cir.1994).

 The Defendants argue that the Court mistakenly applied Title IX to prison industries, prison recreational activities, prison work details and work training programs. The Court, however, is required to accord Title IX "a sweep as broad as its language," *North Haven Board of Ed. v. Bell,* 456 U.S. 512, 521, 102 S.Ct. 1912, 1918, 72 L.Ed.2d 299 (1982), and therefore, it holds that Title IX reaches industries, recreation, work details and work training.

 During congressional debates on Title IX, Senator Bayh, who introduced the

---

7. The Eleventh Amendment states:
 The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

 U.S. Const. amend. XI.

8. The Defendant argues that the men and women prisoners are not "similarly situated" for the purposes of Title IX. Nothing in the record prompts the Court to reverse itself on this issue.

legislation, plainly announced that the proposed law was meant to expand employment opportunities for women:

> It is ... an important first step in the effort to provide for the women of America something that is rightfully theirs—an equal chance to attend the schools of their choice, to develop the skills they want, and to apply those skills with the knowledge that they will have *a fair chance to secure the jobs of their choice* with equal pay for equal work.

118 Cong.Rec. 5808. (1972) (Emphasis added). *See North Haven Board of Education v. Bell,* 456 U.S. at 526–27, 102 S.Ct. at 1920–21 ("Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction.")

██ Title IX's implementing regulations specifically prohibit sexual discrimination in the areas presently at issue. A recipient of federal funds may not discriminate on the basis of sex in the following education programs or activities: industrial, physical education,[9] vocational,[10] technical. 34 C.F.R. § 106.34 (1994). In the area of employment, recipients are prohibited from sexually discriminating when they assist another organization or person in making outside employment available. 34 C.F.R. § 106.38(a) (1994). Use of the word "outside" indicates a clear intent to prevent discrimination in ordinary employment as opposed to the more traditional academic or work training programs. Furthermore, the regulations prevent the recipient from discriminating when they hire for their own needs. 34 C.F.R. § 106.38(b)

(1994). The "outside employment" distinction is important because it destroys the inflexible partition between work and study which the Defendants' interpretation of Title IX creates.[11]

Defendants also ignore the very practical interconnections between work and study at the institutions. In the Court's Memorandum Opinion of December 13, 1994 it found that the completion of academic, vocational, apprenticeship and higher education programs qualifies women prisoners for an increased industrial wage. (R. 10A–48 (Morning Session).) (Memorandum Opinion ("Mem.Op.") at 656.) Work opportunities and academic performance are woven together as in a more traditional work-study context.

### 3. The Fifth Amendment and Equal Protection

██ At trial, the Plaintiffs challenged programs at CTF and the Annex on Equal Protection grounds. The Court decided not to reach that issue because the remedial devices in Title IX sufficiently cover discrimination in educational programs. A decision on the constitutional question was, therefore, not absolutely essential to the disposition of the case. (Mem.Op. at 678.) This issue now comes before the Court in a different posture. In deciding a motion to stay, the Court must decide whether it has rendered a decision on "an admittedly difficult legal question." *See WMATC v. Holiday Tours, Inc.,* 559 F.2d at 844–45. Since the issue raised under Title IX is one of first impression in this Circuit, the Court holds that it should proceed to the Equal Protection claim.[12]

---

9. The regulations also cover intramural athletics. 34 C.F.R. § 106.41(a) (1994).

10. "Vocational education is preparation for the pursuit of a technical, skilled, or semiskilled occupation or trade, or study in a technical field, whether or not the school or institution offers certificates, diplomas, or degrees and whether or not it offers fulltime study." 34 C.F.R. § 106.2(n) (1994).

11. Gender discrimination in vocational education, job placement and apprentice training programs is also prohibited by 34 C.F.R. Pt. 100, App. B, VII(A) & VII(B) (1994) which is an implementing regulation of Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d (1994).

12. Though the "likelihood of success on the merits" analysis may suggest to the parties that the Court's analysis here is merely predictive, the Court's Equal Protection analysis constitutes a substantive modification of the Memorandum Opinion and Order issued by the Court on December 13, 1994. This works no prejudice to either side as this issue has been fully briefed by the parties and, in any event, the Plaintiffs are entitled to raise their Equal Protection claims in the Court of Appeals. *See Dandridge v. Williams,* 397 U.S. 471, 475 n. 6; 90 S.Ct. 1153, 1156 n. 6, 25 L.Ed.2d 491 (1970) ("The prevailing party may, of course, assert in a reviewing court any ground in support of his judgment, whether or not that ground was relied upon or even considered by the trial court.")

The fundamental purpose of the Equal Protection Clause is to compel the government to treat equally all people who are similarly situated.[13] *Cleburne v. Cleburne Living Center,* 473 U.S. 432, 439, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Equal protection principles apply to federal action through the due process clause of the Fifth Amendment. *Bolling v. Sharpe,* 347 U.S. 497, 499, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954). Government policies that seek to distinguish between males and females are subject to scrutiny under the Equal Protection Clause, *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253–54, 30 L.Ed.2d 225 (1971), and anyone defending such a policy must provide an "exceedingly persuasive justification" for it. *Mississippi University for Women v. Hogan,* 458 U.S. 718, 724, 102 S.Ct. 3331, 3336, 73 L.Ed.2d 1090 (1982). Classifications by gender must serve important governmental objectives and must be substantially related to achievement of those objectives. *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456–57, 50 L.Ed.2d 397 (1976). The Supreme Court has rejected administrative ease and convenience as a justification for gender-based classifications. *Id.* at 198, 97 S.Ct. at 457.

In the case of *Pitts v. Thornburgh,* 866 F.2d 1450 (D.C.Cir.1989), the D.C. Circuit Court of Appeals confronted an equal protection challenge by female prisoners. In *Pitts,* the inmates alleged that the District of Columbia's policy of incarcerating long-term female offenders at distant federal facilities violated the Equal Protection Clause. *Id.* at 1451–52. The Court of Appeals applied the heightened scrutiny standard despite the Supreme Court's use of a "reasonableness" standard when reviewing prison regulations in *Turner v. Safley,* 482 U.S. 78, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987).

The *Pitts* court offered two reasons for its application of heightened scrutiny. The Court stated that *Turner* "applies to cases involving regulations that govern day-to-day operation of prisons and that restrict the exercise of prisoners' individual rights within prison" whereas *Pitts* involved "general budgetary and policy choices made over decades in the give and take of city politics." *Pitts v. Thornburgh,* 866 F.2d at 1453–54.

The Court also stated that *Pitts* involved "important concerns that the Supreme Court has clearly held call for stepped-up scrutiny" under the Fifth Amendment. *Id.* at 1454. Equal protection claims are distinct from the personal rights challenges in *Turner* because the former is a "demand that governmental action that affects an individual not be predicated upon constitutionally defective reasoning. The claim charges invidiousness, rather than an unwarranted interference with constitutionally secured liberties." *Id.* at 1455.

The Defendants argue that the differences in treatment between men and women in the areas of recreation, industries and work details, "are largely attributable to the differences in the physical structures in which men and women convicts are incarcerated and in the relative proportion of men and women placing demands on limited space, personnel, and other resources available to the Department of Corrections." (Defs. Reply at 12.) The Defendants also argue that CTF "had been operating for only a short period, and [was] just getting off the ground, when this case was filed, while the facilities the plaintiffs have used for comparison had been in operation for much longer periods." (Id.)

### a. The Annex

The Court finds that the women at the Annex are similarly situated to the men of the Minimum Facility by virtue of their similar custody levels, sentence structures and purposes of incarceration. (*See* Mem. Op. at 675–676.)

The Defendants provide women prisoners at the Annex with an opportunity for work details, recreation and work training that is not equal to the opportunities provided to

---

**13.** The Court will compare prisoners who are similarly situated by virtue of their similar custody levels, sentence structures and purposes of incarceration. The Court holds that women prisoners at the Annex are similarly situated to the male prisoners at Minimum and that women prisoners at CTF are similarly situated to the male prisoners at Occoquan, Central and Medium facilities. (*See* Mem.Op. at 675–676.)

similarly situated men.[14] The decision to provide women prisoners with less opportunity in these areas must serve important governmental objectives and must be substantially related to achievement of those objectives to withstand invalidation.

Women prisoners at the Annex are employed as maintenance workers, housekeepers, receptionists, clerks and librarians, but do not perform skilled chores like carpentry and plumbing. (Mem.Op. at 657.) There is no justifiable reason why women cannot perform the more skilled, less traditional chores within their own facility as similarly situated men may do in their facilities. (Id. at 657.)

In the area of work training, the unequal participation of women is due to the Defendants' inability to complete paperwork, insufficient transportation and failure adequately to publicize those opportunities which are available. (Id. at 658.) There is no important government objective being served.

Recreational opportunity for women at the Annex is not equal due to inferior facilities and limited access to the athletic facilities at the Minimum Facility main compound. (Mem.Op. at 658–659.) To justify the inequality by pointing to the "differences in the physical structures" merely begs the question. Similarly, relying on the "proportion of men and women" does not address the differences in the quality of what the women are offered. The limited resource argument does not explain the unequal distribution of the minimal resources that are available. In sum, the Defendants have failed to raise any important governmental objectives to justify the differences in treatment between men and women prisoners.

The Court holds that the Defendants are liable under 42 U.S.C. § 1983 (1994) for not providing equal opportunities in the areas of recreation, work details and work training at the Annex because this inequality results from the implementation of a policy decision of the Department of Corrections to provide unequal opportunity in these areas. *See Mo-*

*nell v. Department of Social Services,* 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978).

**b. CTF**

The Court finds that the women at CTF are similarly situated to the men of Central, Medium and Occoquan by virtue of their similar custody levels, sentence structures and purposes of incarceration. (*See* Mem.Op. at 675–676.)

The Defendants provide women prisoners at CTF with an opportunity for recreation, industries and work details that is not equal to the opportunity provided to similarly situated men.[15] The decision to provide women prisoners with less opportunity in these areas must, therefore, serve important governmental objectives and must be substantially related to achievement of those objectives.

The main governmental objective behind placing women prisoners at CTF was to save money for the District of Columbia. (Mem. Op. at 648.) The Defendants argue that CTF was still adjusting to the transfer of women prisoners to the facility when the Plaintiffs filed this case and CTF is being compared to facilities that were in full operation for a long time. Many of the problems at CTF, however, stem from the Defendants' own failure to plan, develop and implement either programs or resources for women prisoners. (Mem.Op. at 656.) The continuing programmatic inequalities are not substantially related to the objective of saving money.

In the area of work details, CTF offers positions in maintenance, culinary, clerical, education, environmental, intake, landscape, offices, quick copy, religion and supply management. (Mem.Op. at 660.) Central offers 25 work details which include those found at CTF, but also give men the opportunity to practice trades like plumbing, carpentry, bricklaying, mechanics, painting, welding, air conditioning, and masonry. (Id.) Medium offers the typical support jobs but again of-

---

**14.** The Court found no inequality under Title IX in the area of vocational training, apprenticeships and industries. (Mem.Op. at 658.) The Court finds no violation of the Equal Protection Clause in these areas either.

**15.** Work training is not an issue at this facility.

fers some trades in painting, plumbing, and electrical work. (Id.) Occoquan's offerings include barbering, carpentry, electrical work, heating, painting and plumbing. (Id.)

There is no important governmental objective being served by precluding women from performing some of the skilled details that men are allowed to perform at their respective institutions. Though the physical structures inhabited by the men are different from CTF, there exists nonetheless a need for the performance of skilled details at CTF. Trades like plumbing, carpentry, bricklaying, electrical work, painting, welding, air conditioning, heating and masonry are skills needed to keep almost any building in repair. Though CTF is a relatively new building, its physical problems are well documented. (*See* Mem.Op. at 648–650, 653.) The larger number of men prisoners and the lack of resources do not provide reasons for the lack of opportunity for women at CTF.

In the area of industries, Central offers ten, Medium offers two, Occoquan offers one and CTF offers none. (Mem.Op. at 661.) The Defendants argue that the structure of CTF prevents the establishment of an industry for women. The Defendants' own expert penologist, however, testified that the Defendants should create an industry at CTF. (Mem.Op. at 661.) Such testimony indicates that equality is achievable. Its absence, therefore, is not acceptable.

▮ The amount of recreation at CTF is severely limited by the physical structure of the facility. The structure cannot, however, account for the utterly one-sided opportunities for recreation. Plaintiffs' expert penologist likened the approximately one hour of recreation time a day to the prison disciplinary measure of "segregation". (Mem.Op. at 661.) The smallest allocation of recreation for men allows for two to four hours a day. (Mem.Op. at 661.) Such a contrast clearly violates the principle of equal protection.

▮ The Defendants are liable under 42 U.S.C. § 1983 (1994) for the unequal provision of recreation, industries and work de-

tails at CTF because the situation is a direct result of a policy decision of the Department of Corrections. *See Monell v. Department of Social Services*, 436 U.S. 658, 690, 98 S.Ct. 2018, 2035–36, 56 L.Ed.2d 611 (1978). They are also liable because this deprivation is caused by a governmental 'custom' which has not received formal approval through the Department of Corrections decisionmaking channels. *See Id.* at 691, 98 S.Ct. at 2036.

### 4. Remedies

▮ The Defendants challenge both the statutory and constitutional bases of the four provisions and the Court's power to take those remedial measures. When a court finds prison conditions which violate the law, it has a duty to remedy the offending conditions and, as this Circuit has cautioned, mandate "specific corrections of specific problems." *Inmates of Occoquan v. Barry*, 844 F.2d 828, 841 (D.C.Cir.1988). Courts are to be guided by certain limiting principles. First, "once a right is established the remedy chosen must be tailored to fit the violation," with the scope of the remedy determined by the nature and extent of the violation. *Id.* Courts must identify conditions and order these conditions remedied. *Id.* at 842. If, after ordering specific changes, local authorities are "found wanting", then district courts are empowered to make even broader or "sweeping remedial" changes. *Id.* Second, the remedy chosen must seek to place victims of unlawful conduct in "the position they would have occupied in the absence of such conduct." *Id.* at 841 (quoting *Milliken v. Bradley*, 433 U.S. 267, 280, 97 S.Ct. 2749, 2757, 53 L.Ed.2d 745 (1977). Third, district courts must consider the interests of local authorities in managing their own affairs. *Id.*

▮ The essence of the Defendants' remedies argument is that the Order in this case go beyond what is necessary to cure the violative conditions.[16] The Court holds that the remedies faithfully follow the limiting principles of *Occoquan v. Barry*.

---

16. The Defendants also claims that the remedies are "unrealistic and excessively expensive." (Defs.Cor.Mem. P & A at 6.) The Court cannot discern the legal ground for this argument but assumes it is a restatement of their "overbreadth" argument.

Paragraph 20(a) seeks to remedy specifically the grossly inadequate health education at CTF. (Mem.Op. at 645.) The Order simply mandates a health educator with appropriate training in obstetrics and gynecology in a half-time position to provide clinical and health educational services.

Paragraph 20(b) seeks to remedy specifically the inadequate staffing which results in inadequate obstetrical and gynecological care. (Mem.Op. at 647.) The Order gives the Defendants the choice of adding a nurse practitioner, physician's assistant with special training in obstetrics and gynecology, or nurse midwife to provide clinical services.

Paragraph 43's implementation of an obstetrical and gynecological health education program, like Paragraph 20 specifically addresses the problem of inadequate education. Provision of educational material addresses the absence of any educational materials for women prisoners at CTF. (Mem.Op. at 645.) Maintenance of records allows the parties to prove compliance or noncompliance with the Paragraph.

Given the nature and extent of problems with obstetrical and gynecological care at CTF, the Court holds that these remedies are sufficiently tailored to meet specific existing problems. In addition, these paragraphs of the Order place women prisoners at CTF in a position they would have occupied in the absence of such neglect. They will now be educated and treated.

As to the interests of the District of Columbia in managing its own affairs, Paragraphs 20 and 43 simply conform to the policies of the Department of Corrections. Defendants' policy on health promotion and disease prevention states: "Health Services will provide health education and training in self-care skills to all inmates...." (Mem.Op. at 645.) Furthermore, "[i]t is the policy of Health Services to provide clinically appropriate periodic health examinations and follow-up care to inmates under the [DCDC]." (Mem.Op. at 643.)

Paragraphs 79 and 96 specifically address two blatant inequalities at CTF. There are no apprenticeships at CTF equal to those offered to similarly situated male prisoners.

(Mem.Op. at 660.) Paragraph 79 does nothing more than order the Defendants to remedy this situation and allows them to do so "as defined by Department order."

Similarly, Paragraph 96 is specifically tailored to remedy the unequal provision of recreational opportunities at CTF. (Mem. Op. at 661.) The twenty-five hours of recreation time per week given to women is less than the fifteen hours per day given to males at Central or the all day recreation of males at Medium or the daily seven hours of recreation at Occoquan. (Mem.Op. at 661.) The option to remain indoors or go outdoors is exactly the option men exercise at the similarly situated facilities. Furthermore, Paragraphs 79 and 96, at the very least, place women prisoners in the position they would have occupied in the absence of such inequality.

The Court has been cognizant of the Defendants' interest in managing their own affairs. Paragraph 79 does not offer any specifics as to the type of apprenticeship program to be offered. It simply orders the Defendants to establish one. Paragraph 96 does not set a detailed schedule for recreation but instead provides a weekly amount. The Defendants still retain much latitude within the broad outlines of these two Paragraphs.

In summary, the Court holds that the four paragraphs challenged by the Defendants on "overbreadth" grounds are consistent with the limiting principles which district courts in this Circuit must apply when devising remedies for unlawful prison conditions.

### B. Irreparable Injury to the Defendants

The Defendants justify their Motion for a stay by arguing that the District of Columbia has been declared insolvent by the General Accounting Office and the Order diverts funds to costly improvements. Defendants claim that they cannot afford to hire the two additional staff members required by Paragraph 20 or to start the health education program under Paragraph 43. The Defendants did not make this argument for Paragraph 79 or 96, but even so, "[m]ere injuries, however substantial, in terms of money, time

and energy necessarily expended in the absence of a stay, are not enough." *Virginia Petroleum Jobbers Ass'n v. FPC,* 259 F.2d 921, 925 (D.C.Cir.1958). Though some of this money might be unrecoverable, "[a] party moving for a stay is required to demonstrate that the injury claimed is both certain and great." *Cuomo v. United States Nuclear Regulatory Commission,* 772 F.2d 972, 976 (D.C.Cir.1985). The Court holds that the potential injury from these two provisions does not rise to that level.

### C. Substantial Harm to Other Interested Parties

 "As with irreparable harm to the movant, [the Court] test[s] these harms for substantiality, likelihood of occurrence and adequacy of proof." *Id.* at 977. The provision of health care and education is exceedingly important for people in a high risk health category such as Defendants. Failure to educate and treat obstetrical and gynecological problems will lead to very serious health problems for some members of the Plaintiff class.

At trial the Plaintiffs' expert penologist testified that, in the opinion of the Department of Corrections employees with whom she spoke, the "inability to have a job" was the most common reason for the return of women prisoners to jail. The apprenticeship program cannot be postponed while women prisoners at CTF move closer to their release dates.

Recreation assumes a greater dimension within the context of a controlled movement facility like CTF. The Plaintiffs' expert likened the limited recreation at CTF to punitive segregation which is a form of injury that a prison may legitimately use against prisoners. At CTF, however, such a restriction is the norm. It is a daily substantial injury.

As with the Defendants' funds, the Plaintiffs' potential loss of recreation, health and vocational training are unrecoverable. The Court holds that upon weighing the competing harms, the balance swings toward a denial of the Motion to Stay.

### D. The Public Interest

The Court holds that whatever interest the public has in the Order favors a denial of a Motion to Stay. The interest in saving the public money needed for the four provisions is outweighed by the public interest in having women prisoners leave jail reasonably healthy and with the capacity to hold productive jobs instead of returning to jail for a publicly financed incarceration.

### IV. Analysis of Motion to Modify

In addition to the Motion to Stay, the Defendants have moved the Court to modify its Order. As a preliminary matter, the Court will adopt the modifications proposed by the parties in the Joint Motion, with the exception of Paragraphs 20 and 40. Defendants' arguments for modification generally are premised on legal and practical grounds. The Court will consider each category in turn.

### A. Legal Bases for Modification

The Court is satisfied that its legal analysis of the Eighth Amendment, the Fifth Amendment, Title IX and the D.C.Code adequately support the remedial order issued in this case with the exception of child visitation and child placement issues. The Court will address this issue first. In addition, the Court will review the challenges to the Order under the limiting principles for remedies announced in *Inmates of Occoquan v. Barry,* 844 F.2d 828 (D.C.Cir.1988).[17]

#### 1. Child Visitation and Child Placement Counseling

 In its Memorandum Opinion, the Court held that the lack of child visitation and inadequate child placement counseling at CTF combined to form an Eighth Amendment violation. (Mem.Op. at 669.) Upon reconsideration of the legal issue, the Court holds that issues involving prisoner visitation

---

**17.** The Court will review those challenges outlined in Section D of the Defendants' Revised Motion to Stay and/or Modify the Judgment and the challenges in the Defendants' Supplement to the Corrected Motion.

rights are more appropriately reviewed under the Due Process Clause. On the issue of prisoner contact visits, the Supreme Court has held that the Constitution does not require that prisoners be allowed contact visits "when responsible, experienced administrators have determined, in their sound discretion, that such visits will jeopardize the security of the facility." [18] *Block v. Rutherford,* 468 U.S. 576, 589, 104 S.Ct. 3227, 3234, 82 L.Ed.2d 438 (1984).

Attached to the Revised Motion to Stay and/or Modify Judgment, the Defendants attached the Corrected Declaration of Margaret Moore, Director, D.C. Department of Corrections. Ms. Moore's revised declaration contains additional information not previously provided to the Court. In her revised Declaration, the Director explains that a program allowing for women prisoners to routinely visit their children at D.C. General Hospital would create significant security risks such as escapes, assaults and the passing of contraband. (Moore Dec. at 11–12.) Based on Ms. Moore's evaluation of the security risks, the Court will vacate that portion of the Memorandum Opinion holding that the lack of child visitation violates the Eighth Amendment. The Court will also vacate Paragraphs 39 and 40 of the Order.

Without child visitation as an Eighth Amendment concern, the Court holds that the lack of child placement counseling does not by itself rise to the level of an Eighth Amendment violation.[19] Though the Court regards such matters as exceedingly important, it does not believe that lack of child placement counseling is a deprivation which denies the minimal civilized measure of life's necessities. *See Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 2323–24, 115 L.Ed.2d 271 (1991). The Court, therefore, vacates Paragraphs 41 and 42 of the Order.

### 2. Remedies

As to the remedies for Title IX violations, the Defendants argue that the inequalities can be cured by a redistribution of existing resources and programs and that they should be given the option of redistributing these resources. The remedies which correct Title IX and Equal Protection violations rest on evidence the Court reviewed at trial. The Court realizes that the situation with programs at all of the Defendants' facilities is fluid. The Court does not intend the Order to preclude a redistribution of resources, as long as it can be accomplished within the bounds of the Order and the court orders and consent decrees which control other institutions under the Defendants' control. Nonetheless, the Court does not have before it any evidence that such a redistribution has occurred. If the Defendants devise a plan which offers the Plaintiffs fewer programs than what is contained in the Order but which is also not in violation of Title IX or the Equal Protection Clause, the Defendants may present such evidence to the Court and seek a modification of the Order.

The Defendants' Motion to Stay and/or Modify identifies individual provisions of the Order which they say are not justified. The Court will consider each objection that contains a specific legal argument.[20]

Paragraph 7, *inter alia,* prohibits the Defendants from retaliating against a woman prisoner who reports sexual harassment. This provision specifically addresses problems of retaliation found by the Court at trial. The evidence demonstrated that officers threatened women not to report the

---

18. In a case involving a woman prisoner's right to breast-feed her infant, the Fifth Circuit analyzed the issue as one implicating the right of privacy which includes the right to make personal decisions relating to child rearing without governmental interference. *Southerland v. Thigpen,* 784 F.2d 713 (5th Cir.1986) (quoting *Carey v. Population Services International,* 431 U.S. 678, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977)). The court ultimately denied her request and held that her right to breast-feed her child was inconsistent with the legitimate goals and policies of the penal system. *Id.* at 718.

19. The Court also holds that it does not contravene D.C.Code Ann. § 24–442 (1989).

20. The Defendants objections to Paragraph 24, 25, 26, 27, 28, 30, 31, 32, 36, 37, 44, 45, 49, 50, 58, 84, 85 are essentially disagreements with the Court's Findings of Fact. The Defendants do not present evidence which would cause the Court to amend its Findings of Fact.

incidents of assaults. (Mem.Op. at 639.) Women prisoners were also placed in non-voluntary protective custody after reporting these events. (Id.) This remedy does not prevent the Defendants from legitimately taking punitive action against women prisoners for an infraction. It simply prevents them from using disciplinary measures to cover up sexual harassment.

Paragraph 10 allows women prisoners to submit Inmate Grievance Procedure forms ("IGP's") or complaints orally or in writing to a DCDC employee who must submit it to the monitor and Warden within 24 hours. This provision specifically addresses problems encountered by illiterate prisoners and problems with inconsistent reporting practices of the Defendants. (Mem.Op. at 640.)

The parties have reached an agreement as to the wording of Paragraph 20. The Court, however, will amend Paragraph 20(a) to require the ordered health educator to provide the ordered services to "the entire female prisoner population at CTF." Obstetrical and gynecological care of women prisoners at the Annex is controlled by the consent decree in *Inmates of Three Lorton Facilities v. District of Columbia,* No. 92–1208 (D.D.C.) and such care at the Jail is controlled by *Campbell v. McGruder,* No. 1462–71 (D.D.C.).

▆▆▆ Paragraph 21 requires the Defendants to maintain their current regularly scheduled hours. This specifically addresses problems with understaffing, (Mem.Op. at 647), and overall inadequate OB/GYN care. (Mem.Op. at 643–645.) The Defendants argue that since a clinic already exists this provision is unjustified. In The Special Officer's Report on Compliance with the December 13, 1994 Order, as Amended ("Special Officer's Report") filed on May 10, 1995, the Special Officer informed the Court that, although Paragraph 21 would not take effect for another month, evidence indicated that the clinic operated sporadically between January 1995 and April 1995. (Sp.Off.Rpt. at 20.) The Court holds that this provision corrects a specific problem and it is not an unwarranted intrusion into the Defendants' affairs inasmuch as it merely requires them to maintain the hours of their own clinic.

Paragraph 22 of the Order requires the Defendants to establish a prenatal clinic at CTF. This provision specifically seeks to remedy the inadequate prenatal care given to women prisoners at CTF. (Mem.Op. at 646.) Defendants claim that the needs of women prisoners are met by using the OB/GYN clinic at CTF. The Special Officer's Report contradicts this position. (Sp.Off.Rpt. at 21.) The Court, therefore, will not modify Paragraph 22.

## B. Practical Basis for Modification

Paragraph 79 mandated two apprenticeship programs for CTF. The Defendants claim that they have not been able to find a suitable apprenticeship program. In the Joint Motion, the Defendants informed the Court that they would file a proposal as to Paragraph 79. The Court did not receive a proposal from the Defendants and is not persuaded that no program can be found. The Court will adopt the proposal filed by the Plaintiffs which reduces the requirement to one apprenticeship program.

Paragraph 96 requires the Defendants to provide recreation to women prisoners for five hours a day, seven days a week. The Defendants claim that the physical limitations at CTF prevent compliance. The Court did not receive a proposal from the Defendants on this Paragraph as promised in the Joint Motion. The Court will adopt the Plaintiffs' compromise proposal of twenty-five hours of recreation per week. The weekly allocation of less recreation time gives the Defendants more flexibility to correct this unequal opportunity.

Paragraph 116 orders the Defendants to hire a qualified air balancing contractor to service the CTF air handling system. The Defendants claim that repairs to the system cannot be accomplished within the timeframe of the Order. Paragraph 127 requires the Defendants to install a sprinkler system in the Annex dormitories within six months of the Order. The Defendants also claim that they cannot accomplish this within that period of time. Director Moore estimates that it could take over a year due to testing the water system and the contracting process.

The Court will not modify these two paragraphs. The Defendants may, however, submit a detailed report which explains the measures which have been taken to correct these serious problems, reasons for noncompliance with the Order and any reasonable alternatives to the requirements in the Order.

## V. Conclusion

Since the Court finds that the Defendants have not met the standards necessary to justify a stay, the Court denies the Defendants' Motion to Stay the Judgment. The Court will, however, grant the Defendants' Motion to Modify in part. The Court modifies its Order as to Paragraphs 12, 17, 18, 20, 35, 43, 46, 47, 48, 49, 50, 55, 58, 60, 67, 70, 71, 75, 87, 102, 115, 123 and 124 and vacates Paragraphs 39, 40, 41, 42, 73 and 74.

### *ORDER*

Upon consideration of the Defendants' Revised Motion to Stay and/or Modify Judgment, the Plaintiffs' Opposition to Defendants' Renewed Motion to Stay and/or Modify Judgment, the Defendants' Reply, the Defendants' Supplement, the Plaintiffs' Surreply, the Joint Status Motion and Motion Proposing Modifications to the Order for Injunctive and Declaratory Relief, the Plaintiffs' Status Motion Regarding ¶¶ 79 and 96 of the Order, it is by the Court this 11th day of August, 1995

ORDERED that the portion of the Defendants' Revised Motion to Stay and/or Modify Judgment in which Defendants seek a stay is DENIED; it is further

ORDERED that ¶¶ 73 and 74 of the Court's Order of December 13, 1994 are VACATED due to the termination of the Atlantic Union College program at CTF; it is further

ORDERED that ¶¶ 39, 40, 41, 42 of the Court's Order of December 13, 1994 are VACATED; it is further

ORDERED that ¶¶ 12, 17, 18, 20, 35, 43, 46, 47, 48, 49, 50, 55, 58, 60, 67, 70, 71, 75, 87, 102, 115, 123 and 124 of the Court's Order of December 13, 1994 are amended as follows:

12. Failure of an employee to report any allegation of sexual misconduct or any facts and circumstances which would lead a reasonable employee to believe that sexual misconduct is occurring or has occurred shall subject the employee to discipline.

17. The Department shall conduct mandatory training using certified trainers on sexual misconduct for all DCDC employees. A consultant from the National Institute of Corrections (NIC), mutually agreed upon by the parties, shall develop the training plan and materials. A "certified trainer" is defined as any person who has completed the "Train–the–Trainer" course developed by the NIC consultant. The monitor(s), if they so choose may attend this training.

a. The training shall include education concerning the Defendants' policies regarding reporting, investigating, and preventing sexual harassment, and the consequences for violating any policy concerning sexual harassment; and

b. All staff who work with female prisoners shall be trained by certified trainers within six months commencing no later than August 30, 1995. After the initial training of staff, the training will be included in the pre-service training of all staff. Annual retraining shall be conducted to refresh staff on the Department Order regarding sexual misconduct.

c. Within one year, selected employees working with female prisoners shall receive a forty-hour training program on working with female offenders. A semi-annual, enhancement training on special issues related to working with female offenders will be offered to select employees.

18. Commencing no later than August 30, 1995, the Department shall conduct mandatory training on sexual harassment using certified trainers for all women prisoners currently in the DCDC. A consultant from the National Institute of Corrections (NIC), mutually agreed upon by the parties, shall develop the training plan and materials which will instruct women prisoners on the Department Order on sexual misconduct and how to recognize and report sexual harassment. Training sessions for women prisoners on sexual harassment shall be provided within a

reasonable time upon a woman's entry into the D.C. Department of Corrections.

20. The Defendants shall hire within 90 days: (a) a health educator with appropriate training in obstetrics and gynecology in a half-time position who shall provide clinical and health educational services to the entire female prisoner population at CTF and (b) an additional nurse practitioner, physician's assistant with special training in obstetrics and gynecology, or nurse midwife to provide clinical services to women prisoners at CTF.

35. The Defendants shall develop and implement a protocol concerning restraints used on pregnant and postpartum women which provides that a pregnant prisoner shall be transported in the least restrictive way possible consistent with legitimate security reasons. Specifically, the protocol shall provide:

a. The Defendants shall use no restraints on any woman in labor, during delivery, or in recovery immediately after delivery; and

b. During the last trimester of pregnancy up until labor, the Defendants shall use no restraints when transporting a pregnant woman prisoner unless the woman has demonstrated a history of assaultive behavior or has escaped from a correctional facility, in which case, only handcuffs shall be used.

43. The health educator shall implement, within 60 days from the day that the health educator is hired, an obstetrical and gynecological health education program that satisfies a recognized national medical standard. Educational material should also be made available in the CTF library. The Defendants shall maintain adequate documentation on the program so that it can be evaluated by the Court within 60 days after implementation.

46. If a woman prisoner is in need of emergency obstetrical or gynecological care during evening or weekend hours, she shall be taken immediately to the emergency room at D.C. General Hospital if she is less than 20 weeks pregnant, and to the OB/GYN admitting office if she is 20 or more weeks pregnant, unless employees providing obstetrical and/or gynecological care at D.C. General Hospital determine that the main emergency

room at D.C. General Hospital would be more medically appropriate.

47. The Defendants shall provide each woman prisoner for whom the DCDC has advance notice of her discharge from custody with the following:

a. a supply of essential medications that will last until she may be reasonably expected to obtain necessary follow-up care in her community; and

b. referrals to services in the community to insure continuity of care.

48. If a woman is released prior to the time that abnormal results of any gynecological or obstetrical tests are received by CTF medical personnel, the Defendants shall forward the test result to her last known mailing address. Defendants shall advise women prisoners of this policy.

49. The Defendants shall ensure that prisoners are transported to medical appointments on time.

50. The Defendants shall modify their transportation procedures so that women prisoners arrive at D.C. General Hospital no more than 2 hours before the scheduled time of their appointment.

55. For all pregnant women prisoners, the Defendants shall maintain a medical chart on an ACOG form together with a regular medical chart. All medical visits to or by the responsible physician or primary healthcare provider, orders for laboratory tests, laboratory test results and other notes and orders relating to the medical care of pregnant women prisoners shall be recorded on the ACOG form or consultation form.

58. Documentation shall be required whenever CTF medical staff elect not to follow the instructions of a consulting physician at D.C. General Hospital or elsewhere. This documentation should include the justification for not providing the therapy ordered.

60. Prisoners shall receive notice of normal results of laboratory or diagnostic tests at the discretion of the physician or upon request by the woman prisoner.

67. The Defendants shall ensure that women prisoners are escorted to and arrive at educational programs, recreation, employ-

ment, and medical care in a timely manner as scheduled in a manner that does not prevent the programming staff from performing any of their duties.

70. Women prisoners at the Annex and CTF shall be provided with the opportunity for full-time (three hours per day, five days per week at CTF and five hours per day, five days per week at the Annex) basic education to include ABE, GED, and Special Education classes.

71. Women prisoners at CTF shall have access to on-site higher education programs which shall include a four-year B.A. and/or B.S. degree program, an A.A. degree program, and a precollege program. At a minimum, bachelor programs shall be offered in one area of study, and associate programs in two different areas of study leading to a degree. Defendants shall comply with the precollege requirement of this provision within 90 days.

75. Within 90 days, the Defendants shall provide appropriate substitute teachers or instructors during absences of regular teachers or instructors of more than three working days. The provision of a substitute teacher or instructor shall not result in increasing the class size beyond acceptable community standards for a period of time exceeding 15 consecutive school days.

79. The Defendants shall provide women prisoners at CTF with at least one apprenticeship program as defined by Department order.

87. The Defendants shall revise the Department of Corrections guidelines and practices for work training placement within 30 days to take into account the different sentence structure of female offenders and to permit women's maximum participation in work training.

96. The Defendants shall immediately provide all women prisoners at CTF, including pregnant prisoners subject to medical approval, with recreation for twenty-five hours per week. Women shall have the option of going outside or to indoor recreation facilities during the time period. This recreation schedule shall be effective at CTF within 15 days of this Order.

102. Within one year, the Defendants shall reduce the population of the Annex Dormitories 6 and 7 so that no more than 135 women are housed in the two dormitories combined.

115. Three times every year, the Defendants shall cause the District of Columbia Department of Consumer and Regulatory Affairs (DCRA) to inspect the Annex for compliance with the requirements of environmental sanitation and maintenance and food service delivery (at the main Minimum compound). If any area is shown to be in compliance after completion of an inspection, the mid-year inspection may be an abatement inspection rather than a full inspection. At a minimum, DCRA shall conduct full compliance inspections at the Annex two times every year. Within 30 days of each inspection, the Warden of Minimum shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy an unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

123. The Defendants shall ensure that the correctional officers inspect all plumbing fixtures daily, and shall ensure that any plumbing fixture that requires repair will be reported immediately upon discovery, and repaired in a timely manner. The Defendants shall maintain logs demonstrating compliance with this requirement.

124. Two times per year, the Defendants shall cause the District of Columbia DCRA to conduct inspections of the CTF for compliance with the requirements of environmental sanitation, maintenance and food service delivery. Within 30 days of each inspection, the Warden of CTF shall obtain the DCRA findings. The Warden shall repair, clean, or otherwise remedy any unsanitary, unsound, or unsafe practice or condition identified by DCRA as soon as feasible but in no event later than 30 days following the receipt of the DCRA report.

It is further

ORDERED that all deadlines shall run from the date of entry of this Supplemental Order.