**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MIRIAM MENDIOLA-MARTINEZ, | No. 14-15189 |
| *Plaintiff-Appellant*, | |
| | D.C. No. |
| v. | 2:11-cv-02512-DGC |
| JOSEPH M. ARPAIO, Maricopa County Sheriff; UNKNOWN PARTIES, named as: Jane Doe Officers 1–5, John Doe Officers 1–5, Jane Doe Doctors 1–5, John Doe Doctors 1–5, Jane Doe Nurses 1–5, and John Doe Nurses 1–5 (in their individual capacities); COUNTY OF MARICOPA, as named in amended complaint; MARICOPA COUNTY SPECIAL HEALTH CARE DISTRICT, named Maricopa County Special Health District on amended complaint, | OPINION |
| *Defendants-Appellees.* | |

Appeal from the United States District Court
for the District of Arizona
David G. Campbell, District Judge, Presiding

Argued and Submitted February 11, 2016
San Francisco, California

Filed September 12, 2016

Before: Barry G. Silverman, Raymond C. Fisher,
and Richard C. Tallman, Circuit Judges.

Opinion by Judge Tallman

## SUMMARY[*]

### Prisoner Civil Rights

The panel affirmed in part and vacated in part the district court's summary judgment and award of costs in favor of defendants and remanded in an action brought under 42 U.S.C. §§ 1981 & 1983, by a former female prisoner who alleged that her constitutional rights were violated when, among other things, she was shackled and restrained during her labor and postpartum recovery.

The panel vacated summary judgment for the County Defendants on the shackling claims as they related to shackling while plaintiff was in labor and leaving the Maricopa County Medical Center after the birth of her son, as well as the separately pleaded claim under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), insofar as it concerns these alleged shackling

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

incidents. The panel held that plaintiff presented sufficient evidence for a reasonable jury to conclude that by restraining her when she was in labor and postpartum recovery, the County Defendants exposed her to a substantial risk of serious harm. The panel further determined that a jury could conclude that the County Defendants were aware of the risk caused by restraining an inmate in labor and deliberately indifferent to that risk by restraining her during transport to the Medical Center where she had her baby. The panel remanded for a jury to determine whether the risk posed to plaintiff by the County's restraint policy was justified, or whether the County Defendants went too far.

The panel affirmed the district court's summary judgment for the County Defendants on plaintiff's remaining claims regarding a postpartum leg tether, medical supplies, pregnancy diet and nutrition, and equal protection. Because the County Defendants were no longer the prevailing party on all of their claims, the panel vacated the cost award in favor of the County Defendants and remanded to the district court to determine those costs.

The panel affirmed summary judgment in favor of the Medical Center on all of plaintiffs' claims and likewise affirmed the cost award in its favor.

## COUNSEL

Joy Bertrand (argued), Joy Bertrand Esq., L.L.C., Scottsdale, Arizona, for Plaintiff-Appellant.

Eileen Dennis GilBride (argued) and William R. Jones, Jr., Jones, Skelton & Hochuli, P.L.C., Phoenix, Arizona, for Defendant-Appellee Maricopa County Special Health Care District.

Michele M. Iafrate (argued), Iafrate & Associates, Phoenix, Arizona, for Defendants-Appellees Joseph Arpaio, Maricopa County Sheriff, and Maricopa County.

## OPINION

TALLMAN, Circuit Judge.

We recently recognized that only rarely will prisoners' medical needs "genuinely clash" with the security concerns of prison personnel. *Chess v. Dovey*, 790 F.3d 961, 974 (9th Cir. 2015). That discord may be present when the prisoner is a woman in labor. Miriam Mendiola-Martinez was in the custody of Maricopa County for a nonviolent offense when she gave birth to her son. After her release, she filed suit under 42 U.S.C. §§ 1981 & 1983, alleging that her constitutional rights were violated when, among other things, she was shackled and restrained during labor and postpartum recovery. Mendiola-Martinez brought her claims against Maricopa County and Sheriff Joe Arpaio (collectively "the County Defendants"), the Maricopa County Special Health

Care District ("the Medical Center") where she had her baby,[1] and individual John and Jane Doe defendants. The district court granted summary judgment for the County Defendants and the Medical Center on all of Mendiola-Martinez's claims, and taxed costs against her. She now appeals the summary judgment orders and the cost awards, both of which we have jurisdiction to review under 28 U.S.C. § 1291.

We are presented with an important and complex issue of first impression in our circuit: whether the U.S. Constitution allows law enforcement officers to restrain a female inmate while she is pregnant, in labor, or during postpartum recovery. We hold today that in this case, the answer to that question depends on factual disputes a properly instructed jury must resolve. We therefore vacate and remand the district court's grant of summary judgment for the County Defendants on most of Mendiola-Martinez's shackling claims. We affirm summary judgment in favor of the County Defendants on the remaining claims. We also affirm summary judgment on all claims against the Medical Center. Regarding costs, we vacate the cost award to the County

---

[1] According to the Maricopa Special Health Care District:

> The Maricopa County Special Health Care District Board of Directors is the governing body for Maricopa Integrated Health System ("MIHS"). MIHS is the health care safety net for citizens of Maricopa County, and provides access to high-quality services to everyone in Maricopa County who needs them, regardless of the availability of insurance coverage or economic status. MIHS runs many facilities in Maricopa County, including the Maricopa Medical Center, a full-service hospital where Plaintiff delivered her baby.

Defendants and remand, but affirm the cost award for the Medical Center.

## I

When Mendiola-Martinez was arrested in Arizona for forgery and identity theft on October 19, 2009, she was 6-months pregnant. Because she could not prove she was a legal resident of the United States, she was detained under the Arizona Bailable Offenses Act, Ariz. Rev. Stat. Ann. § 13-3961(A)(5), before we later ruled it unconstitutional. *See Lopez-Valenzuela v. Arpaio*, 770 F.3d 772, 792 (9th Cir. 2014) (en banc), *cert denied*, 135 S. Ct. 2046 (2015). On December 10, 2009, she pleaded guilty to solicitation to commit forgery. Less than two weeks later, while still in the custody of the Maricopa County Sheriff's Office ("MCSO"), Mendiola-Martinez gave birth to a healthy boy. Days later, she was sentenced to time-served and released.

Prior to her release, Mendiola-Martinez was detained at Maricopa County's Estrella Jail in Phoenix, Arizona. At the Estrella Jail, Mendiola-Martinez was given a "modified diet" specifically for pregnant women. This diet consisted of the regular inmate diet, a prenatal vitamin, and an additional 32 ounces of milk.[2] In the affidavit supporting her motion for summary judgment, Mendiola-Martinez stated that she was not given enough food while in custody and that the only water in her cell came from the sink next to the toilet in her

---

[2] MCSO's "Modified Diets" policy states that for pregnant women, the regular inmate diet "shall be supplemented with an additional four (4) cartons of milk per day (one [1] at breakfast, one [1] at lunch, and two [2] at dinner." The County Defendants assert that the pregnancy diet also included a prenatal vitamin.

cell. She asserted that due to those conditions, she was worried that her unborn baby would not survive. Mendiola-Martinez also contended that the MCSO failed to provide her water and food during the "extended periods of time" she was transported from the Estrella Jail to court.

On December 20, 2009, two weeks before her expected delivery date, Mendiola-Martinez began to have contractions.[3] The medical staff at Estrella Jail determined that she was "not in early labor," but ordered her transported to the Medical Center for examination. During the ambulance ride to the hospital, Mendiola-Martinez's wrists were handcuffed in front of her. MCSO officers also shackled her ankles with plastic cuffs connected by a metal chain. After Mendiola-Martinez arrived at the Medical Center, an MCSO officer placed her in restraints while hospital staff utilized a fetal monitor to check on her baby. The Medical Center staff monitored her for two hours, discharged her, and ordered her transported back to Estrella Jail.

The next day, December 21, 2009, the medical staff at Estrella once again ordered her transported to the Medical Center "to rule out active labor." Mendiola-Martinez and the County Defendants dispute whether she was shackled in the ambulance this second time. Mendiola-Martinez testified at her deposition that she was not restrained. But the MCSO deputy who rode with her in the ambulance, Stacey Hertig, testified that Mendiola-Martinez was placed on a gurney before she was lifted into the ambulance and that her hands were cuffed in front of her.

---

[3] The Medical Center records indicate that on December 20, 2009, Mendiola-Martinez was 38 weeks and four days pregnant.

Although Officer Hertig first testified in her deposition that she did not recall whether the EMT in the ambulance asked her to remove the cuffs, she later testified that she removed them at the EMT's request. Officer Hertig also testified that Mendiola-Martinez was "crying and making a lot of noise and movement while we were in the ride." Mendiola-Martinez "kept holding her belly" and appeared uncomfortable. According to Officer Hertig, Mendiola-Martinez "was in a lot of pain." In her Incident Report completed about the transport to the hospital, Officer Hertig wrote that "Mendiola-Martinez was in active labor."

After Mendiola-Martinez arrived at the Medical Center, Dr. Eve LaValley confirmed that she was in "active labor." Around 5:00 p.m. that day, at the Medical Center, Mendiola-Martinez gave birth via cesarean section ("C-section") to a healthy boy she named "Angel." Officer Hertig was in the delivery room when the baby was born. Mendiola-Martinez was not shackled or restrained during the procedure.

After the C-section, Mendiola-Martinez was taken to a post-anesthesia care unit. In her recovery room, an armed MCSO officer placed a grey plastic cuff around Mendiola-Martinez's ankle that was connected to a metal chain. The other end of the chain was then attached to her hospital bed. The chain, which was six to eight feet long, allowed her to walk around her hospital room and to the bathroom. But when she walked, she had to drag the chain, which she alleges aggravated her C-section incision and caused her additional pain. An armed MCSO officer stayed with her in the recovery room.

On December 22, 2009, Mendiola-Martinez's friend came to the hospital to take Angel for the remainder of his mother's

detention. While Angel was at the hospital, Mendiola-Martinez saw him "at least three times," for 15–25 minutes at a time. She did not breast feed him during these visits because, according to Mendiola-Martinez, the nurses had already fed him. Mendiola-Martinez never requested a breast pump to expel her breast milk, and no one at the hospital or the jail clinic prescribed or gave her one.

The next day, December 23, 2009, two MCSO officers came to the hospital to take Mendiola-Martinez to court. The officers removed the restraints from her ankle to allow her to change into her jail uniform. When she finished changing, an officer attached handcuffs to her wrists and metal cuffs to her ankles. The handcuffs were three to four inches apart. In her jail uniform, socks, and cuffs, Mendiola-Martinez was escorted to the nurse's office on a lower floor where other MCSO detainees were waiting and lined up. Still in cuffs and under escort, she had to return to her hospital room to take her medication. She then returned downstairs, where officers chained her to other detainees, and led her out of the building. No one gave her a wheelchair. Mendiola-Martinez was subsequently transported to a jail clinic to continue her recovery. Within two days of leaving the Medical Center, she was sentenced to time served, and released from MCSO custody.

**A**

While Mendiola-Martinez was in jail, the MCSO had in effect a written policy regarding the "Transportation and Restraint of Prisoners and Inmates" ("Restraint Policy"). The Restraint Policy mandated that MCSO officers restrain all inmates during transport, including those who are "sick or injured." While the type of restraint was discretionary based

on the prisoner's condition, the use of a restraint was not. The Restraint Policy provided an exception to the general rule that all inmates must be restrained while outside of the jail, however, when "[m]edical procedures require the absence of restraints during treatment."

The MCSO Restraint Policy also applied to the halls and rooms of the Medical Center, a full-service hospital independent from the MCSO. Under the MCSO Restraint Policy, inmates under guard at the Medical Center had to be restrained "at all times," except when "removal of restraints is determined to be necessary during treatment or examination by the attending physician." Upon arrival at the Medical Center, inmates would be transferred to the custody of a "Ward-41" officer. The Medical Center apparently had its own policy or practice of generally deferring to law enforcement regarding when inmates were to be restrained at the facility.

Although Officer Hertig testified during her deposition that the MCSO had a policy of not using "leg irons" on pregnant women, the MCSO Restraint Policy did not contain an exemption for pregnant women, women in labor, or women in postpartum recovery. Four days before Mendiola-Martinez had her baby, however, the MCSO issued a clarifying "Restraints and Labor" directive dictating when officers could use restraints on women in labor. This memorandum ("active-labor memorandum"), issued by the Sheriff's Transportation Division to all staff, including those working in Ward-41, stated:

> Regarding restraints and epidurals in labor and delivery it will be our practice to remove the restraints when an epidural is used or

during the stage of active labor. We will also remove the restraints when the Doctor orders them removed during the active stages of labor. This is to protect the mother and baby.

Please brief your staff on this immediately as we do not want the liability of a restrained inmate giving birth which resulted in any injury to the mother and child.

The MCSO's Restraint Policy and the treatment Mendiola-Martinez received—as a pregnant inmate in her third trimester, as an inmate in labor, and as an inmate in postpartum recovery—form the bases of her lawsuit against the County Defendants and the Medical Center.

## B

Two years after she was released from MCSO custody, Mendiola-Martinez brought a civil rights action against the County Defendants, the Maricopa County Board of Supervisors,[4] the Medical Center, and, in their individual capacities, John and Jane Doe Officers 1–5, Nurses 1–5, and Doctors 1–5. Her amended complaint states that these Does would "be identified in the course of discovery." None ever were.

Mendiola-Martinez's amended complaint alleged 42 U.S.C. §§ 1981 & 1983 violations for the treatment she received while in MCSO custody. Specifically, her amended

---

[4] On November 19, 2012, the district court granted the Maricopa County Board of Supervisors' motion to dismiss. Thus, the Board is not a party to this appeal.

complaint alleged that all of the defendants were deliberately indifferent to her serious medical needs in violation of the Eighth[5] and Fourteenth Amendments by using restraints and shackles on her while she was in labor and postpartum recovery or acquiescing to the use of those restraints. The amended complaint further alleged that the restraints the MCSO officers used on Mendiola-Martinez constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. We refer to these two groups of claims as the "shackling claims."

Mendiola-Martinez also alleged that all of the defendants were deliberately indifferent to her serious medical needs in violation of the Eighth Amendment by failing to provide her with medically recommended and related supplies. These claims are referred to herein as the "breast pump claims."

The amended complaint also included a single allegation, which we will refer to as the "nutrition claim," that the County Defendants were deliberately indifferent to Mendiola-

---

[5] Eighth Amendment protections apply only once a prisoner has been convicted of a crime, while pretrial detainees are entitled to the potentially more expansive protections of the Due Process Clause of the Fourteenth Amendment. *See Kingsley v. Henrickson*, 135 S. Ct 2466, 2475 (2015) (stating that "pretrial detainees (unlike convicted prisoners) cannot be punished at all"); *see also Castro v. County of Los Angeles*, No. 12-56829, 2016 WL 4268955, at \*4–7 (9th Cir. Aug. 15, 2016). According to her complaint, Mendiola-Martinez pleaded guilty to solicitation to commit forgery on December 10, 2009, but the record is unclear whether she was convicted before she was first taken to the Medical Center on December 20, 2009. Because Mendiola-Martinez's complaint alleges Eighth Amendment violations, we assume her allegations pertain to events transpiring after she was convicted. We therefore analyze her claims as they are alleged—under the Eighth Amendment, rather than the Due Process Clause.

Martinez's serious medical needs in violation of the Eighth Amendment by denying her proper pregnancy nutrition.

An additional count in the amended complaint alleged that the County Defendants and the Medical Center were liable for any constitutional violations caused by their respective policies and practices under *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978). Mendiola-Martinez alleged that the County Defendants' and the Medical Center's policies caused physical, psychological, and emotional injury. Our references to Mendiola-Martinez's "shackling claims," "breast pump claims," and "nutrition claim" encompass her separately pleaded claim for *Monell* liability for the policies and practices that she alleged directly and proximately caused each of these alleged violations of her constitutional rights.

Mendiola-Martinez, who is Hispanic, also brought an equal protection claim against the County Defendants, alleging that the restraint policies regarding inmates in labor and postpartum recovery violated her right to be free from discrimination based on her national origin.

The County Defendants and the Medical Center each filed motions for summary judgment.[6] Mendiola-Martinez filed separate motions for partial summary judgment—one against the County Defendants, and another against the Medical Center. The district court granted summary judgment for the County Defendants and the Medical Center, denied Mendiola-Martinez's motions, and directed the clerk to close

---

[6] Theses motions did not include the individual John and Jane Doe Officers, Doctors, and Nurses.

the case.[7]  The district court clerk later taxed costs against Mendiola-Martinez, amounting to $1,971 for the Medical Center and $936 for the County Defendants.  Mendiola-Martinez timely appealed the district court's grant of summary judgment on January 31, 2014, and on April 22, 2014, amended her Notice of Appeal to include the cost awards.

## II

We review grants of summary judgment de novo. *Crowley v. Bannister*, 734 F.3d 967, 976 (9th Cir. 2013).  In doing so, we must determine whether, viewing the facts in the light most favorable to Mendiola-Martinez as the non-moving party, any genuine issues of material fact exist, and whether the district court correctly applied the substantive law. *Id.*  If a reasonable jury could return a verdict for Mendiola-Martinez, summary judgment is improper. *See Lemire v. Cal. Dep't of Corr. & Rehab.*, 726 F.3d 1062, 1074 (9th Cir. 2013).  If Mendiola-Martinez fails to make a sufficient showing to support an element of her claims, summary judgment is appropriate.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).

We review the district court's cost awards for an abuse of discretion.  *See Ass'n of Mexican-American Educators v. California*, 231 F.3d 572, 591–92 (9th Cir. 2000) (en banc).

---

[7] The district court's summary-judgment order does not mention any of the individual Doe defendants.  Mendiola-Martinez apparently does not appeal the dismissal of these individual defendants.

## III

Mendiola-Martinez asserts that the County Defendants' policy of shackling women during labor and postpartum recovery violated her rights under the Eighth and Fourteenth Amendments. She further contends that because the Medical Center had a policy of acquiescing to the shackling during her postpartum recovery, it too violated her rights.

Because Mendiola-Martinez seeks to hold the County Defendants and the Medical Center liable for constitutional violations as "persons" under § 1983, she must satisfy the requirements for municipality liability established by *Monell* and its progeny.**[8]**  In *Monell*, the Supreme Court held that while a plaintiff could sue a municipality or local government unit under § 1983, these entities were not liable for the malfeasance of their employees.  436 U.S. at 690–91 ("[I]n other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.")  Instead, to establish municipal liability under § 1983, a plaintiff must show "a direct causal link between a municipal policy or custom and the alleged constitutional deprivation." *Castro v. County of Los Angeles*, No. 12-56829, 2016 WL 4268955, at \*10 (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989) (internal quotations omitted).  "Where a plaintiff claims that a municipal action *itself* violates federal law," as Mendiola-Martinez does here by directly challenging what she contends are policies of the County Defendants and the Medical Center, "the issues of fault and causation are straightforward." *Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).  In such situations, "proof

---

**[8]** Mendiola-Martinez does not appeal the apparent dismissal of the individual Jane and John Doe defendants.  *See supra* notes 6 & 7.

that the municipality's decision was unconstitutional would suffice to establish that the municipality itself was liable for the plaintiff's constitutional injury." *Id*. at 405.[9]

## A

Mendiola-Martinez's alleged constitutional injuries stem from the Eighth Amendment's prohibition on cruel and unusual punishment, which prevents government officials from acting with deliberate indifference to a prisoner's health and safety, *see Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002), or serious medical needs, *see Estelle v. Gamble*, 429 U.S. 97, 104 (1976).[10] To prove a violation of the Eighth Amendment, a plaintiff must show that the defendant: (1) exposed her to a substantial risk of serious harm; and (2) was deliberately indifferent to her constitutional rights. *See Farmer v. Brennan*, 511 U.S. 825, 837, 842 (1994).

First, a plaintiff must prove that she suffered a "sufficiently serious" deprivation, such as "incarcerat[ion] under conditions posing a substantial risk of serious harm," *id.*, or that she had a "serious medical need," *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006). This inquiry "is a question of fact, and as such must be decided by a jury if there is any room for doubt." *Lemire*, 726 F.3d at 1075–76.

---

[9] Alternatively, "a plaintiff seeking to establish municipal liability on the theory that a facially lawful municipal action has led an employee to violate a plaintiff's rights must demonstrate that the municipal action was taken with 'deliberate indifference' as to its known or obvious consequences." *Brown*, 520 U.S. at. 407 (citing *Canton*, 489 U.S. at 388).

[10] These duties under the Eighth Amendment are imposed on the states via the Fourteenth Amendment. *Wilson v. Seiter*, 501 U.S. 294, 296–97 (1991).

When assessing whether a plaintiff was exposed to a substantial risk of serious harm, we may look to whether the risk "is not one that today's society chooses to tolerate." *Helling v. McKinney*, 509 U.S. 25, 36 (1993). A medical need is serious when the failure to treat it could result in significant injury or the unnecessary and wanton infliction of pain. *Jett*, 439 F.3d at 1096.

The plaintiff then must prove that the defendant was deliberately indifferent to her health and safety or serious medical needs. *See Farmer*, 511 U.S. at 837. Because Mendiola-Martinez brings her claims under § 1983, she must establish "the state of mind required to prove the underlying violations," even though her claims are against entity defendants. *Brown*, 520 U.S. at 405. While a claim of deliberate indifference against a prison *official* employs a subjective standard, *Farmer*, 511 U.S. at 837, we recently held that an objective standard applies to municipalities "for the practical reason that government entities, unlike individuals, do not themselves have states of mind," *Castro*, 2016 WL 4268955, at*11.[11] This *Castro* objective standard

---

[11] We previously avoided the question of whether to apply *Farmer*'s subjective standard to a constitutional claim of deliberate indifference against a municipality. *See Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.9 (9th Cir. 2002), *overruled by Castro*, 2016 WL 4268955, at \*11. And the Supreme Court has not yet resolved the question. *See Doe By & Through Doe v. Washington County*, 150 F.3d 920, 923 (8th Cir. 1998) ("[T]he [Supreme] Court has not directly addressed the question of how *Monell*'s standard for municipal liability meshes with *Farmer*'s requirement of subjective knowledge."). The Supreme Court has acknowledged, however, that "considerable conceptual difficulty would attend any search for the subjective state of mind of a governmental entity, as distinct from that of a governmental official." *Farmer*, 511 U.S. at 841.

In *Castro*, we noted that the "Supreme Court has strongly suggested that the deliberate indifference standard for municipalities is always an objective inquiry" and held that an objective standard should apply. 2016 WL 4268955, at *11. In doing so, we cited *Canton*, which analyzed whether a municipality could be held liable for failing to adequately train its police officers. *Canton*, 489 U.S. at 388–90 ("The issue in a case like this one . . . is whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'"). The Supreme Court in *Canton* held that a municipality could be liable under such a theory, but that liability would only attach when "a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases." *Id.* at 389. Under *Canton*, a plaintiff can demonstrate a deliberate or conscience choice by showing that the municipality acted with "deliberate indifference." *Id*.

We recognize that the reason Mendiola-Martinez must show "deliberate indifference" here (to prove her Eighth Amendment claim under § 1983) differs from the reason "deliberate indifference" was required in *Canton* (to hold a municipality liable for its failure to train police officers). As the Supreme Court explained:

> Although the term "deliberate indifference" has been used in other contexts to define the threshold for finding a violation of the Eighth Amendment, *see Estelle v. Gamble*, 429 U.S. 97, 104, 97 S. Ct. 285, 291, 50 L.Ed.2d 251 (1976), as we have explained, that term was used in the *Canton* case for the quite different purpose of identifying the threshold for holding a city responsible for the constitutional torts committed by its inadequately trained agents.

*Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 124 (1992).

Although *Castro* relied on *Canton*'s discussion of municipal liability under *Monell*, rather than an Eighth Amendment claim that requires deliberate indifference, we see no reason why the objective standard of deliberate indifference we adopted in *Castro* should not apply to constitutional claims against a municipality like Mendiola-Martinez's.

is satisfied when "a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission [or act] is substantially certain to result in the violation of the constitutional rights of their citizens." *Id.* (quoting *Canton*, 489 U.S. at 396 (O'Connor, J., concurring in part and dissenting in part)) (emphasis omitted).

**1**

The district court never determined whether the County Defendants' policies led to a violation of Mendiola-Martinez's rights under *Monell.* Instead, it ruled that Maricopa County and Sheriff Arpaio were entitled to qualified immunity on the shackling claims and granted summary judgment on that basis. The district court erred in doing so.

Qualified immunity protects government officials from liability for civil damages. *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Government officials are entitled to qualified immunity unless: (1) a plaintiff's allegations make out a violation of a constitutional right; and (2) the right was clearly established at the time of the officials' alleged misconduct. *See id*. at 231–32. As permitted under *Pearson*, *id.* at 236, the district court began with the second part of this inquiry and found that the constitutional right Mendiola-Martinez was seeking to enforce—to be completely free of restraints during labor and postpartum recovery—was not clearly established when she was in MCSO custody.

---

The same "conceptual difficulty" of searching for the "subjective state of mind of a government entity" applies. *Farmer*, 511 U.S. at 841.

But as a threshold matter, Maricopa County is not eligible for qualified immunity because counties "do not enjoy immunity from suit—either absolute or qualified—under § 1983." *Leatherman v. Tarrant Cty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *see also Lowry v. City of San Diego*, 818 F.3d 840, 855 (9th Cir. 2016) ("[Q]ualified immunity analysis is irrelevant to the issue of *Monell* liability.") (citing *Brandon v. Holt*, 469 U.S. 464, 471 (1985)). Therefore, granting qualified immunity to Maricopa County was "plainly wrong." *Henry A. v. Willden*, 678 F.3d 991, 999 (9th Cir. 2012) (reversing district court's grant of qualified immunity to county defendant and emphasizing that qualified immunity protects *officials* only). "Qualified immunity simply does not apply to these claims." *Id*.

Sheriff Arpaio is likewise not eligible for qualified immunity. When a county official like Sheriff Arpaio is sued in his official capacity, the claims against him are claims against the county. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Ctr. for Bio-Ethical Reform v. L.A. Cty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008) (holding that sheriff was a "redundant defendant" in lawsuit against county and county sheriff in his official capacity). Mendiola-Martinez brought this action against Sheriff Arpaio in his official capacity as the person who "oversees the operations of the Maricopa County jails and is responsible for and accountable for ultimate decisions of the Office." She does not contend that Sheriff Arpaio is personally liable for the alleged constitutional violations, nor does she allege that he is liable as a supervisor under a vicarious liability theory. *See Crowley*, 734 F.3d at 977. Accordingly, Sheriff Arpaio, like

Maricopa County, is not eligible for qualified immunity and awarding summary judgment on that basis was improper.[12]

The proper question regarding the County Defendants was not whether they are entitled to qualified immunity, but whether a reasonable jury could find that MCSO policies caused a violation of Mendiola-Martinez's constitutional rights. *See Monell*, 436 U.S. at 690–91. When briefly discussing the County Defendants' liability under *Monell*, the district court touched on this question by stating that Mendiola-Martinez had not shown that any employee of the County violated her constitutional rights. But the district court never directly analyzed or answered the question, so we will do so here.

**2**

MCSO's Restraint Policy requires officers to restrain all inmates during transport and while at the hospital. The Restraint Policy does not exempt women who are pregnant from being restrained when outside of an MCSO jail. And it appears the active-labor memorandum, issued days before Mendiola-Martinez gave birth, did not apply to her.[13]

---

[12] Even a finding by the district court that the individual Jane and John Doe defendants were entitled to qualified immunity would not absolve the County Defendants from liability: "If a plaintiff established he suffered constitutional injury *by the [County]*, the fact that individual officers are exonerated is immaterial to liability under § 1983." *Fairley v. Luman*, 281 F.3d 913, 917 (9th Cir. 2002).

[13] The County Defendants' position at oral argument that the active-labor memorandum applied to Mendiola-Martinez is contrary to its position before the district court. In the County Defendants' statement of facts accompanying its motion for summary judgment, the County

Therefore, we must assess whether a jury could find that the Restraint Policy exposed Mendiola-Martinez to a substantial risk of serious harm.

But even before assessing the severity of the risk Mendiola-Martinez faced under the Restraint Policy, a factual dispute emerges about whether she was restrained during the second transport on December 21, 2009. Mendiola-Martinez testified that she was not restrained, while Officer Hertig testified that she was handcuffed before the EMT asked Officer Hertig to remove the cuffs. We cannot resolve this important factual issue when reviewing a summary-judgment

---

Defendants asserted that the "only distinction between the policy at the time of Plaintiff's incarceration and now is that the current policy prohibits pregnant inmates from being restrained during active labor." Relying on this purported fact, the County Defendants argued the following to the district court in their motion for summary judgment:

> The prevailing policy at the time of Plaintiff's incarceration required restraint of the pregnant inmates during transport and during recovery from delivery. (SOF ¶ 50). This policy remains in effect. The only distinction between the policy at the time of Plaintiff's incarceration and now is that the current policy prohibits pregnant inmates from being restrained during active labor. (SOF ¶ 51). Plaintiff, however, was never restrained during labor. (SOF ¶ 52).

We do not allow parties to switch their positions on appeal. *See Reynoso v. Giurbino*, 462 F.3d 1099, 1110 (9th Cir. 2006) (holding that a party is bound by a concession to the district court notwithstanding a contrary position on appeal). The County Defendants are thus bound to their previous position that the Restraint Policy in place at the time of Mendiola-Martinez's incarceration required restraining inmates in labor, unless or until a medical professional asked an officer to remove the restraints.

ruling. Viewing the evidence in the light most favorable to Mendiola-Martinez, however, we think a jury could believe Officer Hertig's version of events and find that Mendiola-Martinez was restrained, pursuant to the Restraint Policy in effect at the time, while in labor in the ambulance. This dispute is material to her claim and precludes summary judgment only if a jury could find that handcuffing Mendiola-Martinez in the second ambulance ride was a violation of the Eighth Amendment. Because such a finding is possible, summary judgment for the County Defendants was improper.

**3**

As evidence that the County Defendants' policy subjected Mendiola-Martinez to a substantial risk of harm, Mendiola-Martinez offered the expert report of Dr. Carolyn Sufrin, an Assistant Professor and Physician of the Department of Obstetrics, Gynecology and Reproductive Sciences at the University of California, San Francisco. The expert report states that shackling at "any point in pregnancy" and "during postpartum recovery" poses a threat to the mother. The expert opines that shackling is problematic because of the increased risk of tripping and a "potentially life-threatening" fall. Shackling during labor is "dangerous," according to the expert, because restraints limit the ability of health care providers to evaluate the woman. Further, restraints could cause injury to a pregnant woman while she moves her body to mollify painful contractions. According to the expert, the risk of falling is also present after a C-section, and restraints on women in postpartum recovery increase that risk as well. The expert further opines that postpartum restraints are problematic because walking after a C-section is necessary to decrease the risk of blood clots, and restraints restrict a woman's ability to walk freely and carefully.

The doctor who treated Mendiola-Martinez, Dr. LaValley, similarly testified that it was "unsafe" for a woman to be shackled during pregnancy. Dr. LaValley also stated that she would object to restraints being placed on a woman after a C-section. She did clarify, however, that a restraint allowing the patient to walk around after a C-section would be acceptable.

Mendiola-Martinez also cites to our sister circuits and two district courts that have found, under the facts of their respective cases, that shackling female prisoners while they are in labor creates a substantial risk of serious harm and violates contemporary standards of decency. In *Villegas v. Metropolitan Government of Nashville*, 709 F.3d 563, 574 (6th Cir. 2013), the Sixth Circuit held:

> [S]hackling of pregnant detainees while in labor offends contemporary standard of human decency such that the practice violates the Eighth Amendment's prohibition against the "unnecessary and wanton infliction of pain"—i.e., it poses a substantial risk of serious harm.

Finding disputed issues of fact as to whether the plaintiff was a flight risk and whether the defendant subjectively knew of the risk of shackling an inmate in labor, the Sixth Circuit vacated summary judgment for the plaintiff. *Id.* at 578.

Similarly, in *Nelson v. Correctional Medical Services*, 583 F.3d 522, 529 (8th Cir. 2009) (en banc), the plaintiff's expert testified by affidavit that shackling "'is inherently dangerous to both the mother and the unborn fetus' and that it may interfere with the response required 'to avoid potentially life-threatening emergencies for both the mother

and the unborn fetus.'" *Id.* at 529.  Based on this undisputed report, the lack of evidence that the plaintiff was a flight risk, and the possibility the defendant officer knew of the risks of shackling, the Eighth Circuit held that a rational jury could find that the individual officer applying the restraints violated the Eighth Amendment.  *See id.* at 531

In *Brawley v. Washington*, 712 F. Supp. 2d 1208 (W.D. Wash. 2010), the plaintiff's expert testified that the shackles used on the plaintiff while she was in labor exposed her to a serious risk of harm and injury.  *Id.* at 1219.  The district court found that in addition to the expert testimony, "[c]ommon sense" and the defendant's own policy, which prohibited restraints during labor and delivery, "tells us that it is not good practice to shackle women to a hospital bed while they are in labor."  *Id.*  Denying summary judgment for the defendants, the district court ruled that the plaintiff had shown she had a serious medical need and was exposed to an unnecessary risk of harm when she was shackled while in labor and immediately postpartum.  *Id.* at 1219–20.

All of the above cases cite to *Women Prisoners of D.C. Department of Corrections v. District of Columbia*, 877 F. Supp. 634 (D.D.C. 1994) *vacated in part, modified in part*, 899 F. Supp. 659 (D.D.C. 1995), which appears to be the first federal case to address this issue.  In that class action, the district court held that "[w]hile a woman is in labor and shortly thereafter, . . . shackling is inhumane."  *Id.* at 668. The district court also acknowledged that restraints may be necessary for a female prisoner with "a history of assaultive behavior or escapes."  *Id.*

The defendants seek to evade the persuasive force of these cases by arguing that the facts here are less egregious.

It is true that the plaintiffs in *Nelson*, *Villegas*, and *Women Prisoners* may have endured greater injury or risk of injury than Mendiola-Martinez due to the type of restraints used and the duration and timing of those restraints.  In *Nelson*, for example, the plaintiff's legs were both shackled to the opposite sides of her hospital bed "well into the final stage of labor" and prevented her from "moving her legs, stretching, or changing positions."  583 F.3d at 525–26.  In *Villegas*, the plaintiff's wrists and ankles were cuffed together while she was on a stretcher for transportation to the ambulance. 709 F.3d at 566.  When she arrived at the hospital, officers restrained one of her legs to the hospital bed while she was in labor and removed the restraint two hours before she gave birth.  *Id.* at 567.  And in *Women Prisoners*, when transporting pregnant women for medical visits, the defendants "customarily place[d] women in leg shackles, handcuffs and a belly chain with a box that connect[ed] the handcuffs and belly chain."  877 F. Supp. at 646.

Despite the factual distinctions, these cases support Mendiola-Martinez's position.  First, the cases show that the four courts that have dealt with this issue have found that objectively, shackling women in labor exposes them to a risk so serious that it amounts to a constitutional violation. *Cf. Fain v. Rappahannock Reg'l Jail*, No. 3:12CV293-JAG, 2013 WL 3148145, at *5–6 (E.D. Va. 2013) (declining to determine whether shackling female inmate in labor was a constitutional violation after holding that individual defendants were entitled to qualified immunity because the right to be free of restraints while in labor was not clearly established).  Although the pregnant inmates in *Nelson* and *Women Prisoners* were restrained further into the birthing process and forced to labor under more restrictive restraints,

the County Defendants may still have exposed Mendiola-Martinez to an unjustified risk of serious harm.

Additionally, the injuries caused by the restraints in these cases—such as permanent hip injury, torn stomach muscles, an umbilical hernia, and injured and deformed hips, *see Nelson*, 583 F.3d at 526—show the severity of the risks posed by shackling women in labor. Even if the actual harm Mendiola-Martinez suffered is less severe than the physical injuries claimed by the *Villegas* and *Nelson* plaintiffs, a reasonable juror could find that she faced an excessive risk of harm.

These cases are also aligned with the chorus of organizations that have warned of the danger of restraining women in labor and decried the practice, which is relevant to our inquiry—whether "today's society chooses to tolerate" the risk posed by restraining women in labor. *Helling*, 509 \U.S. at 36. The organizations include: the American Medical Association, American College of Obstetricians and Gynecologists, the United Nations, and Amnesty International. *See Villegas*, 709 F.3d at 572–73. These same organizations acknowledge, however, that shackles may be necessary, despite the risks, when an inmate poses a flight or safety risk. *See id.* at 572–74 (citing reports).

The State of Arizona also has recognized the risk of shackling pregnant women. In 2012, three years after Mendiola-Martinez gave birth to Angel in Maricopa County, Arizona, the state legislature banned the use of certain restraints on a prisoner "who is being transported for delivery or during labor, delivery and postpartum recovery" unless restraints are requested by the attending medical staff or a corrections officer determines that the prisoner "presents an

extraordinary circumstance." Ariz. Rev. Stat. Ann. § 31-601(A).[14] Additionally, MCSO itself recognized the risk of restraining a woman in "active labor" when it announced its new practice of not restraining women in active labor "to protect the mother and the baby" days *before* Mendiola-Martinez gave birth.

Unlike the defendants in *Villegas*, 709 F.3d at 576–77, the County Defendants provide no evidence disputing the severity of the risk caused by restraining an inmate during labor or postpartum recovery. Therefore, we find that Mendiola-Martinez has presented sufficient evidence for a reasonable jury to conclude that by restraining Mendiola-Martinez when she was in labor[15] and postpartum recovery, the County Defendants exposed her to a substantial risk of serious harm.

Instead of disputing the risk posed by the Restraint Policy, the County Defendants seek to justify the policy by arguing that it "serves a legitimate government purpose, specifically the safety and security of the inmate, detention officers, hospital personnel, as well as the general public." Of course, ensuring the safety of inmates, staff and the public is a worthy objective, and in some circumstances, justifies the use of

---

[14] This statute appears to apply to Maricopa County. *See* Ariz. Rev. Stat. Ann. § 31-601(F)(1) (defining "correctional institution" as "any entity under the authority of any state or county law enforcement agency"). The statute permits the use of a "security tether chain" attached to an inmate's ankle and a hospital bed during postpartum recovery. *Id.* § 31-601(D).

[15] To make such a finding, the jury also would have to find that Mendiola-Martinez was restrained in the ambulance while in labor on December 21, 2009.

restraints on certain inmates. *See, e.g.*, *Keenan v. Hall*, 83 F.3d 1083, 1092 (9th Cir. 1996) *opinion amended on denial of reh'g*, 135 F.3d 1318 (9th Cir. 1998) ("[F]or the protection of staff and other inmates, prison authorities may place a dangerous inmate in shackles and handcuffs when they move him from his cell."); *LeMaire v. Maass*, 12 F.3d 1444, 1457 (9th Cir. 1993) (restraining a "dangerous" inmate while he showered did not violate the Eighth Amendment despite a risk of slipping because it was a "security imperative"); *see also Bell v. Wolfish*, 441 U.S. 520, 546 (1979) ("[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of both convicted prisoners and pretrial detainees."). It is a relevant consideration here as well. We recognize that prison officials have a "better grasp" of the policies required to operate a correctional facility than either judges or juries. *See id*. at 548. For this reason, in excessive force and conditions of confinement cases, we instruct juries to defer to prison officials' judgments in adopting and executing policies needed to preserve discipline and maintain security. *See Chess*, 790 F.3d at 972–73 (citing *Norwood v. Vance*, 591 F.3d 1062, 1067 (9th Cir. 2010)).

Such deference is generally absent from serious medical needs cases, however, where deliberate indifference "can typically be established or disproved without the necessity of balancing competing institutional concerns for the safety of prison staff or other inmates." *Whitley v. Albers*, 475 U.S. 312, 320 (1986); *see also Chess*, 790 F.3d at 973 ("[S]ecurity considerations are usually not present in medical care cases."). Therefore, whether the County Defendants are entitled to deference depends on the type of claim Mendiola-Martinez brings against them: do her shackling claims

challenge the conditions her confinement? Or are they of the medical-needs variety?

Mendiola-Martinez contends that her shackling claims are a hybrid of both. We agree that her shackling claims do not fit neatly into either category. *See Villegas*, 709 F.3d at 571 (discussing the "crossover nature of a pregnant shackling claim" recognized in *Nelson*, which combines language from cases involving medical needs and conditions of confinement). Her challenge to the Restraint Policy is more akin to the "outlier cases" we recognized in *Chess*, "in which medical care and security concerns genuinely clash and prison personnel must make their medical care decisions in light of those concerns." 790 F.3d at 974. In such unusual situations, the district court must instruct the jury to defer to the prison officials who adopted and executed a practice or policy needed to preserve discipline and maintain internal security. *See id.*; *see also* Ninth Circuit Model Civil Jury Instruction § 9.25.[16] That deference, however, comes with an important caveat: "The [Supreme] Court has held that deference must be given to the officials in charge of the jail unless there is 'substantial evidence' demonstrating their response to the situation is exaggerated." *Chess*, 790 F.3d at 974 (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 132 S. Ct. 1510, 1518 (2012)); *see also Lemire*, 726 F.3d at 1079 ("A prison official's justification for exposing inmates to a substantial risk of harm is reasonable only if it represents a proportionate response to the

---

[16] After *Chess*, Ninth Circuit Model Civil Jury Instruction § 9.25 was modified to apply deference language to all conditions of confinement cases, and to medical needs cases only when a policy addresses security concerns and the challenged decision was made pursuant to a security-based policy.

penological circumstances in light of the severity of the risk to which the inmates are exposed.").[17]  A jury could find in this case that the restraints used on Mendiola-Martinez were an "exaggerated" response to the County Defendants' safety concerns.  Mendiola-Martinez was arrested for a nonviolent crime, and the County Defendants have failed to show she was a danger to others.  Nor is there any evidence that Mendiola-Martinez was a flight risk.  In fact, Officer Hertig, who escorted Mendiola-Martinez to the hospital and was with her during the C-section and shortly afterward, testified that Mendiola-Martinez was not a specific security threat and did not give any indication that she would try to escape.

Mendiola-Martinez's physical condition when she was transported to the Medical Center and after her C-section also make it highly unlikely that she would flee or fight.  Her expert states that "labor contractions are extremely painful and would preclude a woman from absconding in the few minutes in between contractions."  The expert additionally notes that "[p]ost-operative pain after abdominal surgery [like a C-section] makes it nearly impossible for someone to run." *See also Women Prisoners*, 877 F. Supp. at 668 ("[T]he physical limitations of a woman in the third trimester of pregnancy and the pain involved in delivery make complete shackling redundant and unacceptable in light of the risk of injury to a woman and baby.").

---

[17] This is consistent with the holdings of *Villegas*, 709 F.3d at 574, and *Nelson*, 583 F.3d at 534, as well as the reports of the medical and human-rights organizations we referenced, which all recognize that prison staff may be justified in restraining a woman in labor and postpartum recovery if she is a threat to herself or others, or poses a flight risk that they cannot otherwise manage. *See Villegas*, 709 F.3d at 573–74.

Furthermore, pursuant to the Restraint Policy, an armed officer remained with Mendiola-Martinez at all times while she was at the hospital, even when she was undergoing a C-section and under anesthesia. Even if Mendiola-Martinez was contemplating an escape, the armed officer outside of her hospital door may have negated the need for any restraint. Without more than a broad assertion about the penological interest in restraining all inmates—even one who is in labor—a reasonable jury could find that the Restraint Policy exposed Mendiola-Martinez to a substantial and unjustified risk of harm.

**4**

Our inquiry does not end there, for the County Defendants are liable only if Mendiola-Martinez demonstrates that they were deliberately indifferent to her constitutional rights. *See Farmer*, 511 U.S. at 837, 842; *see also supra* pp. 15–19. In this case, MCSO's active-labor memorandum, which states that women in active labor would not be restrained to avoid harm to the woman and the baby, seems to "explicitly acknowledge that substantial risks of serious harm exist" when restraining a woman in labor. *Castro*, 2016 WL 4268955, at \*12 (quoting *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.10 (9th Cir. 2002), *overruled by Castro*, 2016 WL 4268955, at \*11)).[18] Therefore, a jury

_____

[18] *Castro* overruled *Gibson* only to the extent that *Gibson* suggested a subjective test for showing that a municipality was deliberately indifferent. *See Castro*, 2016 WL 4268955, at \*11. Therefore, *Gibson*'s holding that certain evidence was sufficient to show subjective intent, a more stringent standard than the objective test we apply here, is still relevant. *See id.* at \*12 (citing *Gibson*, 290 F.3d at 1188 n.10, as authority for its holding that "'a municipality's policies [that] explicitly

could conclude that the County Defendants were aware of the risk caused by restraining an inmate in labor and deliberately indifferent to that risk by restraining Mendiola-Martinez during transport.

A jury could also infer the County Defendants' awareness of the risk of restraining Mendiola-Martinez while she was in labor because the risk is obvious. *See Hope*, 536 U.S. at 745 ("The obvious cruelty inherent in this practice should have provided respondents with some notice that their alleged conduct violated [the plaintiff's] constitutional protection against cruel and unusual punishment."); *Nelson*, 583 F.3d at 534 ("Existing constitutional protections . . . would have made it sufficiently clear to a reasonable officer in September 2003 that an inmate in the final stages of labor cannot be shackled absent clear evidence that she is a security or flight risk."); *Women Prisoners*, 877 F. Supp. at 669 (finding that the risk caused by complete shackling of an inmate in her third trimester of pregnancy was "obvious"); *see also Farmer*, 511 U.S. at 841 (describing *Canton*'s objective understanding of deliberate indifference as permitting liability premised on "obviousness or constructive notice").

Whether the County Defendants were deliberately indifferent to any risk created by restraining women in postpartum recovery is a closer question. Such a risk is not as obvious as restraining an inmate in labor. Mendiola-Martinez's expert states that walking "without restraint" after a C-section is necessary to prevent blood clots. But Mendiola-Martinez testified that she could walk around the room with the six-to-eight foot "leg tether," which was longer

---

acknowledge that substantial risks of serious harm exist' may demonstrate municipal knowledge of that risk").

than the other chains used to restrain her, and that nurses came into the room to help her walk around. The use of a leg tether long enough to permit Mendiola-Martinez to walk around indicates that the County Defendants were aware of the risk of restraining woman in postpartum recovery and sought to neutralize the risk, not disregard it. Therefore, we conclude that a reasonable jury could *not* find that the use of the leg tether constituted deliberate indifference to Mendiola-Martinez's health and safety in violation of her constitutional rights. Summary judgment on this aspect of Mendiola-Martinez's shackling claims was proper.

The length of the tether works against the County Defendants, however, when we look at the restraints applied to Mendiola-Martinez as she left the Medical Center. In *Gibson*, the defendant county had employed a mental health professional at its jail to screen detainees for mental health issues. 290 F.3d at 1191. The county then dropped the mental health professional position, leaving it vacant for four years. *Id.* Based on those facts, we held that a jury could find that the county was deliberately indifferent to the mental health needs of its detainees because the existence of the screening program showed that the county subjectively knew screenings were necessary to provide adequate health care and avoid serious harm to detainees. *Id.*

Similarly, the long leg tether placed on Mendiola-Martinez tends to show that the County Defendants knew that a woman in postpartum recovery needed to walk relatively freely to mitigate the risk of falling.[19] A jury could find that

---

[19] It is possible that a longer tether is used on all inmates staying overnight at the Medical Center, and not just on inmates in postpartum recovery. But from this record, we know only that the longer tether was

the County Defendants then ignored the need for a longer tether or chain to permit safe walking when, pursuant to the Restraint Policy, MCSO officers cuffed Mendiola-Martinez's wrists and ankles, chained her to other inmates, and escorted her out of the Medical Center days after her C-section. Viewing the sparse evidence here in the light most favorable to Mendiola-Martinez, we hold that a jury could find the County Defendants were deliberately indifferent to any risk created by the restraints used on Mendiola-Martinez when she left the Medical Center.

We therefore vacate summary judgment in favor of the County Defendants on Mendiola-Martinez's shackling claims as they relate to shackling while Mendiola-Martinez was in labor and leaving the Medical Center. We affirm summary judgment for the County Defendants on Mendiola-Martinez's remaining shackling claim regarding the postpartum leg tether. We remand for a jury to resolve the factual dispute about whether Mendiola-Martinez was restrained in the second transport on December 21, 2009. The jury will also have to determine whether Mendiola-Martinez has proved her deliberate-indifference claim against the County Defendants regarding restraints during labor and in postpartum recovery when she left the Medical Center.[20] At trial, the district court

---

used on Mendiola-Martinez. Viewing the evidence in Mendiola-Martinez's favor, the longer tether supports an inference that the County Defendants knew that an inmate in postpartum recovery needs a longer chain.

[20] Ninth Circuit Model Civil Jury Instruction § 9.25 lists "harm to the plaintiff" as another element of a deliberate-indifference claim. We also leave to the jury the issue whether the Restraint Policy caused Mendiola-Martinez the harm she alleges, but note that psychological harm is

should give the jury the deference instruction in Ninth Circuit Model Civil Jury Instruction § 9.25, but emphasize that the County Defendants are not entitled to deference if the jury finds that their response to any security or escape threat Mendiola-Martinez posed was "exaggerated." *Chess*, 790 F.3d at 974 (quoting *Florence*, 132 S. Ct at 1518)).

**B**

We now turn to the shackling claims against the Medical Center. In granting summary judgment for the Medical Center on those claims, the district court did not apply qualified immunity. Instead, the district court found that Mendiola-Martinez had not proffered sufficient evidence to support her claims and survive summary judgment. We agree.

While at the Medical Center, Mendiola-Martinez was shackled only after her C-section. She asserts that the Medical Center's policy and practice of deferring to law enforcement about when patients should be shackled or restrained violates the Eighth Amendment. Once again, Mendiola-Martinez is taking the "direct path" to liability under *Monell* by challenging what she contends is an unconstitutional policy. *See Gibson*, 290 F.3d at 1185. And under § 1983 and the Eighth Amendment, she must demonstrate that the Medical Center had policies that (1) exposed her to a substantial risk of serious harm; and (2) were deliberately indifferent to her constitutional rights. *Farmer*, 511 U.S. at 837, 842.

---

sufficient. *See, e.g.*, *Jordan v. Gardner*, 986 F.2d 1521, 1530 (9th Cir. 1993).

First, Mendiola-Martinez presents no evidence that the Medical Center's practice of deference exposed her to any substantial risks. On the contrary, the alleged practice apparently applied only when no substantial risk of harm existed. Dr. LaValley, who treated Mendiola-Martinez at the Medical Center, testified that on prior occasions she has asked guards to remove an inmate's restraints, for instance when they interfere with a mother's ability to walk or to breastfeed, and MCSO officers have always complied with these requests. Additionally, Mendiola-Martinez testified that when she told a nurse her ankle cuff was hurting her, the nurse asked an MCSO officer to loosen the restraint and the officer complied. Accordingly, there is no absolute deference to law enforcement decisions by the Medical Center on this record. Medical personnel are permitted to (and do) ask officers to remove or adjust restraints for patients' safety or comfort. This mitigates—rather than creates—any risk of harm caused by the restraints.

Further, even assuming the Medical Center's general policy of deference exposed Mendiola-Martinez to a substantial risk of serious harm, Dr. LaValley's testimony that a restraint that allowed an inmate to walk about during postpartum recovery would be acceptable and that medical personnel could ask to have restraints loosened or removed as necessary leaves no reason to believe the Medical Center was deliberately indifferent to Mendiola-Martinez's health and safety.

Because Mendiola-Martinez has not presented a material factual dispute to preclude summary judgment on this issue, the district court properly granted summary judgment for the Medical Center on the shackling claims.

**IV**

We next address whether summary judgment for the County Defendants and the Medical Center was proper on Mendiola-Martinez's breast pump claims. Mendiola-Martinez contends that the County Defendants and the Medical Center were deliberately indifferent to her serious medical needs by prohibiting her from using, or failing to provide her with, a breast pump.

Mendiola-Martinez lacks a plausible theory of liability supported by facts on the breast pump claims as to both the County Defendants and the Medical Center. She does not attempt to link any policy or practice of the County Defendants or of the Medical Center to the alleged failure to provide her with a breast pump. *See Monell*, 436 U.S. at 691; *see also Canton*, 489 U.S. at 394 ("[A] § 1983 plaintiff seeking to attach liability to the city for the acts of one of its employees may not rest on the employment relationship alone; both fault and causation as to the acts or omissions of the city itself must be proved."); *cf. Villegas*, 709 F.3d at 578–79 (noting plaintiff's allegation that defendant prohibited her from using a breast pump pursuant to its policy).

Nor does Mendiola-Martinez demonstrate that some omission, such as a failure to train, caused the alleged failure to provide her with a breast pump. *See Canton*, 489 U.S. at 387–90. Therefore, even if individual employees of the County Defendants or the Medical Center were deliberately indifferent to Mendiola-Martinez's need for a breast pump—which Mendiola-Martinez has not shown—the County Defendants and the Medical Center could not be liable under § 1983. *See Monell*, 436 U.S. at 691. Because Mendiola-Martinez lacks a basis for municipal liability, we

affirm summary judgment for Defendants on her breast pump claims.

## V

We now review the remaining claims asserted solely against the County Defendants. Mendiola-Martinez argues that the County Defendants' nutrition policy constituted deliberate indifference to her serious medical needs.[21] The Eighth Amendment "requires only that prisoners receive food that is adequate to maintain health." *Foster v. Runnels*, 554 F.3d 807, 813 n.2 (9th Cir. 2009) (quoting LeMaire, 12 F.3d at 1456). We have previously found that the "repeated and unjustified failure" to provide inmates adequate sustenance "amounts to a serious depr[i]vation" in violation of the Eighth Amendment. *Foster*, 554 F.3d at 814. In *Foster*, denying an inmate sixteen meals over twenty-three

---

[21] Mendiola-Martinez styles her nutrition claim as a serious medical needs claim. Previous § 1983 claims regarding prison nutrition have been brought as conditions of confinement claims. *See, e.g.*, *Foster v. Runnels*, 554 F.3d 807, 812 (9th Cir. 2009); *LeMaire*, 12 F.3d at 1447, 1449–50. We recognize that we should give "due regard for differences in the kind of conduct against which an Eighth Amendment objection is lodged." *Whitley*, 475 U.S. at 320. Here, however, whether Mendiola-Martinez asserts her nutrition claim as a serious medical needs claim or a conditions of confinement claim is of no consequence. Either way, the Eighth Amendment's deliberate indifference standard applies. *See, e.g.*, *Hope*, 536 U.S. at 737–38; *Whitley*, 475 U.S. 312 at 319 ("It is obduracy and wantonness, not inadvertence or error in good faith, that characterize the conduct prohibited by the Cruel and Unusual Punishments Clause, whether that conduct occurs in connection with establishing conditions of confinement, [or] supplying medical needs . . . ."); *Estelle*, 429 U.S. at 104. And either way, as we discuss *infra*, Mendiola-Martinez has not shown that any alleged deprivation of food or water was sufficiently serious to trigger Eighth Amendment protection.

days was sufficiently serious to violate the Eighth Amendment. *Id*. at 812–13. The denial of those meals, as well as the inmate's allegations of dizziness, weight loss, and headaches, all led to the permissible inference that the inmate's nutrition was inadequate and could not sustain him. *Id*. at 813 n.2.

Mendiola-Martinez lacks sufficient evidence to support her nutrition claim and survive summary judgment. She has not provided any evidence that the supplemental pregnancy diet she received was insufficient or that the water from her cell's sink was unsanitary. She likewise has not supported her allegation that she was deprived of sufficient food and water when going to court. Nor has Mendiola-Martinez shown that the County Defendants were deliberately indifferent to the nutritional needs of pregnant women. Instead, she merely points to an amended judgment from District Judge Neil Wake in *Graves v. Arpaio*, No. 77-0479, 2008 WL 4699770 (D. Ariz. Oct. 22, 2008),[22] in which he found that the food provided to MCSO inmates in that case violated their right to adequate food.

No evidence has been offered in the present case to make Judge Wake's findings applicable here. There is no evidence that the food Mendiola-Martinez received was moldy, inedible, or inadequate under the United States Department of Agriculture's recommended caloric intake. *See Graves*, 2008 WL 4699770, at *42. Nor has Mendiola-Martinez shown or even alleged that the food she received left her or her baby in poor health. *See Foster*, 554 F.3d at 813 n.2.

---

[22] We believe that this order is the one on which Mendiola-Martinez relies. Due to the citation errors in Mendiola-Martinez's brief, we cannot be certain.

Furthermore, without knowing what a pregnancy diet should include, no jury could gauge whether the extra milk and pre-natal vitamin prescribed by MCSO's modified diet for pregnant women was inadequate. And unlike in *Graves*, there is no evidence demonstrating that Mendiola-Martinez did not actually receive those supplemental provisions. *See Graves*, 2008 WL 4699770, at \*44.

Finally, any inference a jury could draw from Mendiola-Martinez's claim that she was hungry would not establish a serious deprivation within the meaning of the Eighth Amendment. *Cf. Foster*, 554 F.3d at 813 (concluding that even though the record contained no evidence about the nutritional value of meals, the jury could infer meals were inadequate due to inmate's testimony that he was denied meals completely and suffered dizziness and headaches); *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061 (9th Cir. 2002) ("[T]his court has refused to find a 'genuine issue' where the only evidence presented is 'uncorroborated and self-serving' testimony." (quoting *Kennedy v. Applause, Inc.*, 90 F.3d 1477, 1481 (9th Cir.1996)). The district court properly granted summary judgment for the County Defendants on the nutrition claim.

## VI

Mendiola-Martinez alleges that the MCSO Restraint Policy disparately impacts pregnant women born outside of the United States because they are more likely to be detained under the Arizona Bailable Offenses Act, Ariz. Rev. Stat. Ann. § 13-3961, than similarly-situated United States citizens.

The district court construed this equal protection claim as a challenge to the Arizona Bailable Offenses Act, rather than the MCSO Restraint Policy.  But Mendiola-Martinez's amended complaint and supplemental appellate briefing clearly show that she is challenging the Restraint Policy, not the Arizona Bailable Offenses Act.[23]  Because we may affirm summary judgment on any ground supported by the record, *Lee v. Kemna*, 534 U.S. 362, 391 (2002), we now turn to whether a reasonable jury on the record before us could find that the Restraint Policy was unconstitutionally discriminatory toward inmates like Mendiola-Martinez.  We hold it could not.

The Equal Protection Clause of the Fourteenth Amendment "is essentially a direction that all persons similarly situated should be treated alike." *Lee v. City of Los Angeles*, 250 F.3d 668, 686 (9th Cir. 2001) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). To survive summary judgment, Mendiola-Martinez must show that the MCSO Restraint Policy not only had a discriminatory impact, but that it was enacted with an intent or purpose to discriminate against members of a protected class. *See Comm. Concerning Cmty. Improvement* ("*CCCI*") *v. City of Modesto*, 583 F.3d 690, 702–03 (9th Cir. 2009). Mendiola-Martinez's contention that she need not show discriminatory intent is incorrect.  The Supreme Court has clearly stated that "'[p]roof of racially discriminatory intent or purpose is required' to show a violation of the Equal Protection Clause." *City of Cuyahoga Falls, Ohio v. Buckeye*

---

[23] In fact, the Arizona Bailable Offenses Act was already successfully challenged. *See Lopez-Valenzuela*, 770 F.3d at 792 (holding that Arizona Bailable Offenses Act categorically forbidding bail for certain undocumented immigrants violated substantive due process).

*Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (quoting *Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265 (1977)).

In determining whether a discriminatory intent or purpose exists, we may consider direct evidence of discrimination, statistical evidence showing a discriminatory impact, or other factors that could reveal a discriminatory purpose, like the historical background of the policy. *See CCCI*, 583 F.3d at 703. Mendiola-Martinez, however, has not presented sufficient evidence of discriminatory intent or purpose—direct, statistical, or otherwise.

As direct evidence of intent, Mendiola-Martinez relies on offensive quotes about Mexican nationals attributed to Sheriff Arpaio and published in newspapers. Even if those hearsay statements were admissible, however, they do not mention the Restraint Policy and do not otherwise lead to any inference that Sheriff Arpaio's 2006 Restraint Policy was promulgated to discriminate against Mexican nationals.

Without direct evidence of discrimination, Mendiola-Martinez seeks to demonstrate the discriminatory purpose behind the Restraint Policy with statistical evidence. When challenging a facially neutral policy like the Restraint Policy, "proof of disproportionate impact on an identifiable group, such as evidence of 'gross statistical disparities,' can satisfy the intent requirement." *Id.* at 703. But the statistical evidence Mendiola-Martinez presents here is woefully inadequate to achieve her goal. Mendiola-Martinez provides only general population statistics about Maricopa County: "31.8% of Maricopa County's residents are Hispanic or Latino," and "[n]inety percent of the undocumented immigrants in Maricopa County are from Mexico." She also

cites to a district court order summarizing census data on Hispanics and Latinos in Maricopa County. *See Melendres v. Arpaio*, 989 F. Supp. 2d 822, 828–29 & n.2 (D. Ariz. 2013).

But these general population statistics do not establish that Mexican nationals are disproportionately impacted by the Restraint Policy, and Mendiola-Martinez simply fails to present any comparative figures to attempt to show disparate impact. *See Darensburg v. Metro. Transp. Comm'n*, 636 F.3d 511, 519–20 (9th Cir. 2011) ("The basis for a successful disparate impact claim involves a comparison between two groups—those affected and those unaffected by the facially neutral policy." (quoting *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 575 (2d Cir. 2003)). Her numbers reveal no "statistical disparit[y]," let alone a "gross" statistical disparity necessary to show discriminatory intent. *CCCI*, 583 F.3d at 703.

Mendiola-Martinez has not identified any other proof of discriminatory intent. *See id.* (noting that other factors may show discriminatory intent, such as a policy's historical background, the sequence of events leading to the decision, and the administrative history of the challenged statute). We therefore assume that the Restraint Policy was not born of discrimination and ask whether it was "rationally related to a legitimate government interest." *Id.* As Mendiola-Martinez's counsel recognized at oral argument, the Restraint Policy, even if potentially problematic when applied to women in labor or postpartum recovery, is rationally related to the legitimate government interest of ensuring the safety and security of law enforcement, the public, and the inmates. *See Hudson v. Palmer*, 468 U.S. 517, 526–27 (1984) (recognizing that prison officials "are to take all necessary steps to ensure

the safety of not only the prison staffs and administrative personnel, but also visitors" and "are under an obligation to take reasonable measures to guarantee the safety of the inmates themselves"). We affirm the district court's entry of summary judgment on the equal protection claim because Mendiola-Martinez failed to present sufficient evidence that the Restraint Policy violated the Equal Protection Clause of the Fourteenth Amendment. *See Celotex*, 477 U.S. at 322–23.

## VII

Our final task is to determine whether the district court abused its discretion by taxing costs against Mendiola-Martinez in favor of the County Defendants and the Medical Center. *See Ass'n of Mexican-American Educators v. California*, 231 F.3d 572, 591–92 (9th Cir. 2000) (en banc). Federal Rule of Civil Procedure 54(d)(1) provides that the court clerk should tax costs, other than attorney's fees, for the prevailing party, unless the Rules, federal law, or a court order directs otherwise. A district court may review the clerk's judgment on taxation of costs only upon the filing of a timely motion. *See* Fed. R. Civ. P. 54(d)(1).

The judgment against Mendiola-Martinez taxes $1,971 for the Medical Center and $936.37 for the County Defendants. Because we vacate summary judgment for the County Defendants on most of the shackling claims, we must also vacate the cost award for the County Defendants and remand to the district court to reassess costs in light of our decision. *See id.*

We affirm the cost award in favor of the Medical Center. Mendiola-Martinez waived her right to appellate review of

the cost award by neglecting to move for district court review under Rule 54(d)(1). *See Walker v. California*, 200 F.3d 624, 626 (9th Cir. 1999) ("[A] party may demand judicial review of a cost award only if such party has filed a proper motion within the . . . period specified in Rule 54(d)(1)."). Failing to file the proper motion is "dispositive." *Id.* Additionally, Mendiola-Martinez's objection to the bill of costs was untimely under the local rule of the District of Arizona, LRCiv. 54.1(b), and the cost award for the Medical Center was one-third less than the amount the Medical Center sought in the bill of costs. There was no abuse of discretion, and we affirm the cost award to the Medical Center.

## VIII

We are mindful that the administration of a penal institution is "at best an extraordinarily difficult undertaking." *Hudson*, 468 U.S. 517, 527 (1984) (quoting *Wolff v. McDonnell*, 418 U.S. 539, 566 (1974)). Crafting a restraint policy that balances safety concerns with the inmates' medical needs is equally challenging. But it is not impossible. And we leave it to a jury to decide whether the risk the Maricopa County Restraint Policy posed to Mendiola-Martinez was justified, or whether the County Defendants went a step too far.

In conclusion, we vacate summary judgment for the County Defendants on the shackling claims as they relate to shackling while Mendiola-Martinez was in labor and leaving the Medical Center, as well as the separately pleaded *Monell* claim insofar as it concerns these alleged shackling incidents. We remand for a jury to determine whether liability and compensation is appropriate on these claims. We affirm summary judgment for the County Defendants on Mendiola-

Martinez's remaining claims regarding the postpartum leg tether, medical supplies, pregnancy diet and nutrition, and equal protection. Because the County Defendants are no longer the prevailing party on all of their claims, we vacate the cost award in favor of the County Defendants and remand to the district court to determine those costs.

We affirm summary judgment in favor of the Medical Center on all of Mendiola-Martinez's claims and likewise affirm the cost award in its favor.

Each party shall bear its own costs on appeal.

**AFFIRMED IN PART, VACATED IN PART, and REMANDED.**